

**RICHARD BLUMENTHAL**
ATTORNEY GENERAL

MacKenzie Hall
110 Sherman Street
Hartford, CT 06105-2294

Office of The Attorney General
**State of Connecticut**

Tel: (860) 808-5450
Fax: (860) 808-5591

February 2, 2004

**To the Chambers of:**
The Honorable Stephan R. Underhill
United States District Court
915 Lafayette Boulevard
Bridgeport, CT 06604

Re:   **D'Angelo v. Kirschner**
      No. 3:02CV1313(SRU)

Dear Judge Underhill:

The defendants' Motion to Dismiss in the above-captioned matter is scheduled for oral argument on **Monday, February 09, 2004.** I write to bring to your attention a recent decision of the Second Circuit on the issue of qualified immunity in the context of an arrest warrant application, *Escalera v. Lunn,* 2004 U.S. App. LEXIS 339 (2d Cir. 2004), January 12, 2004, attached.

In this case, the Second Circuit discusses what it calls "the corrected affidavits doctrine" previously referred to in defendants' moving papers. *Id.* at *12. What is more interesting, however, is the Second Circuit's discussion of "arguable probable cause," also in the context of qualified immunity. *Id.* at *11. The Court states:

> Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was "arguable probable cause" to arrest. Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Golino [v. City of New Haven, 950 F.2d 864] at 870.
> …
> Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; "arguable probable cause" will suffice to confer qualified immunity for the arrest.

Honorable Stephan R. Underhill
February 2, 2004
Page 2

(emphasis added) (some internal cites, quotes omitted). This case makes clear that the standard for evaluating a claim of qualified immunity is a lesser standard than a determination of probable cause.

The defendants respectfully submit that an application of the law as set forth in *Escalera*, and other authority cited by the defendants, to the facts as alleged in the complaint, inevitably leads to the conclusion that all of the defendants in this matter are entitled to qualified immunity as a matter of law with regard to plaintiff's claims of false arrest and unreasonable search. The undersigned counsel looks forward to an opportunity to answer any questions the Court has at oral argument.

Very truly yours,

Lynn D. Wittenbrink
Assistant Attorney General

LDW:lac

c:  Jon D. Golas, Esq.
    Golas, Golas & Golas, P.C.
    945 Main Street, Suite 306
    Manchester, CT  06040
    (With Enclosure)

ROBERT ESCALERA, Plaintiff-Appellee, --v.-- GLENNA LUNN, individually, LOUIS CRISCI, individually, ROCCO A. POZZI, individually, and THE COUNTY OF WESTCHESTER, NEW YORK, Defendants-Appellants.

Docket No. **03-7121**

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

2004 U.S. App. LEXIS 339

October 8, 2003, Argued
January 12, 2004, Decided

PRIOR HISTORY: [*1] Interlocutory appeal from the denial of summary judgment for defendants by the United States District Court for the Southern District of New York (Charles L. Brieant, Jr., District Judge) on the ground that there were genuine issues of material fact as to whether appellants had probable cause to arrest and prosecute appellee. *Escalera v. County of Westchester, 299 A.D.2d 548, 751 N.Y.S.2d 37, 2002 N.Y. App. Div. LEXIS 11457 (N.Y. App. Div. 2d Dep't, 2002)*

DISPOSITION: Reversed and remanded with instructions.

CASE SUMMARY:

PROCEDURAL POSTURE: Appellee individual brought a federal action against appellants, various persons and a county, and claimed false arrest and malicious prosecution in violation of his constitutional rights, pursuant to *42 U.S.C.S. § 1983*. Defendants moved for summary judgment. The court denied motion. Defendants interlocutory appealed from the denial of summary judgment for defendants by the United States District Court for the Southern District of New York.

OVERVIEW: Defendants in this *42 U.S.C.S. § 1983* action conceded at oral argument that they were not challenging denial of summary judgment in the malicious prosecution claim; the appeal was to that extent dismissed. The district court denied the defendants' motions on the ground that there were factual disputes as to whether there was probable cause to arrest and prosecute the individual. The court of appeals applied the "correction analysis" in this case, which yielded an objective basis that would have supported a reasonable officer's belief that probable cause existed. Knowledge of a victim witness's criminal or psychiatric history, alone, was not enough to destroy probable cause or strip officers of qualified immunity on the basis of arguable probable cause. The question was not whether there were discrepancies, even substantial discrepancies, between the victim's accounts, but whether officers of reasonable competence could disagree on whether the probable cause test was met.

OUTCOME: The court of appeals reversed and remanded with instructions on the district court's denial of summary judgment on the individual's false arrest claim.

CORE TERMS: cell, probable cause, false arrest, arrest, qualified immunity, arguable, summary judgment, tylenol, probable cause to arrest, corrected, deposition, door, window, warrant application, correction, arbitrator, probable cause existed, arrest warrant, inmate, breast, psychiatric, discrepancy, misconduct, pajamas, tooth, competence, arrested, block, corroborated, nightgown

LexisNexis (TM) HEADNOTES - Core Concepts:

Civil Procedure: Summary Judgment: Summary Judgment Standard
Civil Procedure: Summary Judgment: Appealability
Civil Procedure: Summary Judgment: Standards of Review
[HN1] While a United States Court of Appeals ordinarily lack jurisdiction to review a denial of summary judgment, an exception exists where the motion is filed on the basis of qualified immunity. Such jurisdiction is nevertheless limited to circumstances where the qualified immunity defense may be established as a matter of law. The court's review extends to whether a given factual dispute is "material" for summary judgment purposes, it may not review whether a dispute of fact identified by the district court is "genuine." A district court's mere

assertion that disputed factual issues exist," however, is not "enough to preclude an immediate appeal. Rather, the court has jurisdiction to review a denial of qualified immunity to the extent it can be resolved on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
Evidence: Procedural Considerations: Burdens of Proof
[HN2] To establish a claim for false arrest under *42 U.S.C.S. § 1983*, a plaintiff must show that the defendant intentionally confined him without his consent and without justification. Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff. Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
Evidence: Procedural Considerations: Burdens of Proof
[HN3] For purposes of *42 U.S.C.S. § 1983*, even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was "arguable probable cause" to arrest. Arguable probable cause exists if either: (a) it has been objectively reasonable for the officer to believe that probable cause existed; or (b) officers of reasonable competence could disagree on whether the probable cause test was met. Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; "arguable probable cause" will suffice to confer qualified immunity for the arrest.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
Evidence: Procedural Considerations: Burdens of Proof
[HN4] For purposes of *42 U.S.C.S. § 1983*, a plaintiff must demonstrate that the misstatements and omissions are necessary to the finding of probable cause. This determination is a mixed question of law and fact and implicates what has come to be known as the "corrected affidavits doctrine." Under this doctrine, a court looks to the hypothetical contents of a "corrected" application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law. In performing this correcting process, the court examines all of the information the officers possessed when they applied for the arrest warrant. If there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity. Only if the corrected affidavit would not support a reasonable officer's belief that probable cause existed would the identified factual disputes be material to resolving the issue.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
[HN5] Case law is clear that in reviewing cases on qualified immunity motions, a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the corrected affidavit would have supported a finding of arguable probable cause.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
[HN6] For purposes of *42 U.S.C.S. § 1983*, knowledge of a victim witness's criminal or psychiatric history, alone, is not enough to destroy probable cause or strip officers of qualified immunity on the basis of arguable probable cause. The relevant standard under arguable probable cause is whether officers of reasonable competence could disagree on whether the probable cause test was met.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
[HN7] For purposes of *42 U.S.C.S. § 1983*, the question is not whether there were discrepancies, even substantial discrepancies, between the victim's accounts, but whether officers of reasonable competence could disagree on whether the probable cause test has been met.

Constitutional Law: Civil Rights Enforcement: Immunity: Public Officials
Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871: Prison Officials
[HN8] In New York the elements of official misconduct are the commission of an act with an intent to obtain a benefit constituting an unauthorized exercise of his official functions. *N.Y. Penal Law § 195.00*.

Civil Procedure: Jurisdiction: Subject Matter Jurisdiction: Supplemental Jurisdiction
Civil Procedure: Summary Judgment: Appealability

Civil Procedure: Summary Judgment: Standards of Review
[HN9] Once a United States Court of Appeals has taken jurisdiction over one issue in a case it may, in the court's discretion, exercise pendent appellate jurisdiction over related issues.

COUNSEL: TERENCE M. O'NEIL, Rains & Pogrebin, P.C., Mineola, NY, (James P. Clark, on the brief), for Appellants.

JONATHAN LOVETT, Lovett & Gould, Esqs., White Plains, NY, for Appellee.

JUDGES: Before: WALKER, Chief Judge, JACOBS and WESLEY, Circuit Judges.

OPINIONBY: JOHN M. WALKER, JR.

OPINION:
JOHN M. WALKER, JR., Chief Judge:

Defendants-appellants Glenna Lunn, Louis Crisci, and Rocco Pozzi bring this interlocutory appeal from the order of the United States District Court for the Southern District of New York (Charles L. Brieant, Jr., District Judge), denying their motion seeking summary judgment on the basis of qualified immunity against plaintiff-appellee Robert Escalera's claims of false arrest and malicious prosecution pursuant to 42 U.S.C. § 1983. The County of Westchester, New York [*2](the "County") asks this court to exercise pendent appellate jurisdiction to review the district court's denial of its motion for summary judgment. The district court denied the defendants' motions on the ground that there were factual disputes as to whether there was probable cause to arrest and prosecute Escalera.

We reverse the district court's denial of summary judgment on Escalera's false arrest claim. n1

------------------Footnotes------------------

n1 At oral argument, appellants withdrew their appeal of the district court's denial of summary judgment on Escalera's malicious prosecution claim.

-------------End Footnotes-------------

I. BACKGROUND

Escalera, at all relevant times, was employed as a Corrections Officer by the County. Lunn is a Police Detective employed by the County; Crisci is a Sergeant employed in the Special Investigations Unit ("SIU") of the Westchester Department of Corrections ("DOCS"); and Pozzi is Commissioner of DOCS.

In July 1999, the SIU commenced an investigation of corrections officers at the Westchester correctional facility, in Valhalla, New York[*3] based on information that a female inmate was being sexually abused by a corrections officer other than Escalera. During this investigation, Lunn and Crisci were informed by inmate Tracey Dineen that Dineen had been told by inmate Alison Blanton about possible sexual misconduct by Escalera involving another inmate, subsequently determined to be Diamaris Gonzalez. On December 30, 1999, Blanton, who, like Gonzalez, was imprisoned in E Block, was interviewed by Lunn and Crisci and made a written statement that "on or about the ninth of December, I heard a male officer['s] voice talking about 4:30 a.m. . . . . I [peeked] out of my window and I saw [Escalera]. He was shining his flashlight and making moving gestures with his hands [and] telling [Gonzalez] to turn around shaking his head and saying things like turn around, stop, okay . . . . I thought I saw [Gonzalez] naked but I'm not [ ] sure."

On December 30, 1999, following interviews with Dineen and Blanton, Lunn and Crisci interviewed Gonzalez about a possible sexual interaction between Gonzalez and Escalera. In a supporting deposition dated December 30, 1999, Gonzalez asserted:

I woke up with a tooth ache [sic]. [*4] I had my pajamas on. I called [Officer Escalera] to give me tylenol for my tooth ache. C.O. Escalera complemented [sic] my body. He said if I wanted tylenol he wanted to see my body. In order for me to get my tylenol I pulled up my pajamas and showed him my breast. The second time C.O. Escalera tolded [sic] me for the next two tylenols I would have to show him my body again. But this time he ask me to touch my toes. Having my behind facing the door. Exposing my behind to him. I told him "no" and only pulled up my pajamas so he could only see my breast again. And told him to give me my tylenols.

On January 4, 2000, Gonzalez gave Lunn another supporting deposition alleging that in the early morning hours of January 1, 2000, shortly after Gonzalez first met with Lunn and Crisci, Escalera woke Gonzalez up, asked her questions about the investigation and said, "'You

better had not told [sic] them anything.'. . . in a threatening manner." Gonzalez was "very scared." Female inmates Maria Morales and Josephina Mendoza, housed in the same cell block with Gonzalez, corroborated Gonzalez's account of this interaction with Escalera. Morales stated that Escalera asked Gonzalez questions[*5] about the investigation for fifteen minutes. In a separate statement, Mendoza said that "[Escalera] went from one cell to the other to pressure them about who wrote and said what" and that "[Gonzalez] was crying (yelling)."

On January 21, 2000, Gonzalez amended her December 30, 1999 statement, stating, with respect to the December 11, 1999 incident that:

I had a tooth ache [sic] that woke me up out of my sleep. I got up to use the toilet and the dorm was very hot so I only had my panties on. I saw C.O. Escalera doing his round he was at E-1 cell so I quickly got up got my nightgown and pulled it over my head and when my head was through the nightgown, I looked up to see C.O. Escalera at my cell door E-17 with his flashlight on, staring at me. At that moment I ask C.O. Escalera for tylenol for my tooth ache [sic]. I already had pulled my nightgown down. When I asked for the tylenol C.O. Escalera stared me up and down and said "I'll be right back." When he return at my cell I ask him for the tylenol he said "Can I see something." I said "No!" C.O. Escalera said again "Let me see something." This time my tooth began to hurt more and I lift up my nightgown to show C. [*6] O. Escalera my breast in order to get my tylenol.

Approximately half an hour later C.O. Escalera came back to my cell E-17 and flash the light on my face and light up my window. He called me over and showed me 2 (two) more tylenol. When I ask for them that's when C.O. Escalera again asked me to show him something. I said "No!" again. But C.O. Escalera kept persisting for me to show him my body in order for me to get my tylenol. C.O. Escalera said he wanted me to bend over and touch my toes exposing my behind and vagina area. I said "NO" and only showed him my breast again. That's when C.O. Escalera gave me the other two tylenol.

On January 26, 2000, Lunn arrested Escalera pursuant to a warrant. The Westchester County District Attorney's Office (the "DA") pursued criminal charges against him based on information that had been obtained over the six-month SIU investigation. Escalera was charged with three counts of misdemeanor Official Misconduct based on the two alleged incidents with Gonzalez on December 11, 1999 (requiring her to expose her breast) and on December 30, 1999 (threatening her after she spoke with Lunn and Crisci). Specifically, the complaint alleged that Escalera, [*7] with intent to obtain a benefit or deprive another person of a benefit, committed three separate acts relating to his office but constituting an unauthorized exercise of his official function, knowing that such acts were unauthorized under *N.Y. Penal Law § 195.00*.

Throughout 2000 and into the fall of 2001, Escalera was the subject of a civil disciplinary arbitration proceeding by DOCS on charges that paralleled the criminal charges. On November 10, 2001, the arbitrator dismissed all disciplinary charges and ordered the County to return Escalera to duty. On December 6, 2001, upon the prosecutor's motion, the criminal court dismissed the criminal charges against Escalera.

Escalera brought this federal action against the individual defendants and the County, claiming false arrest and malicious prosecution in violation of his constitutional rights, pursuant to *42 U.S.C. § 1983*. The defendants moved for summary judgment. In denying the motion, the district court held that factual disputes existed as to whether defendants had probable cause to arrest and prosecute Escalera.

With respect to Escalera's false arrest claim against Lunn, [*8] the district court found that the arrest warrant secured by Lunn was "obviously defective" because no supporting affidavit was presented to the magistrate and Lunn did not mention in the application that there were conflicting statements by the key witness. Indeed, the court found that the complaint was purposely made to appear as if it were based on Lunn's own personal knowledge. In the absence of a warrant, the district court determined that a jury could find that there was no probable cause and, thus, that Escalera's arrest was unlawful.

As to Escalera's false arrest claim against Crisci, the district court found that Crisci's preparation of a materially false transcript and the County's attempt to introduce the "doctored" transcript in the arbitration plainly undermined Crisci's veracity and called into question all of the information used to arrest Escalera on January 26, 2000.

As to the false arrest claim against Pozzi, the district court, relying on two cases in which complaints against DOCS were filed by corrections officers, who, like Escalera, alleged false arrest claims under *42 U.S.C. § 1983*, held that a jury could find a departmental practice[*9] or custom of unfounded arrests attributable to Pozzi, the Commissioner of DOCS.

Finally, with respect to the false arrest claim against the County, the district court held that, because Pozzi was a

policy maker of the County and other defendants might also be policy makers, a jury could find that Escalera's arrest was part of a custom of the municipality.

This interlocutory appeal followed.

II. DISCUSSION

Jurisdiction

[HN1] While we ordinarily lack jurisdiction to review a denial of summary judgment, see *Golino v. City of New Haven, 950 F.2d 864, 868 (2d Cir. 1991)*, an exception exists where the motion is filed on the basis of qualified immunity, *Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003)*. Such "jurisdiction is nevertheless limited to circumstances where the qualified immunity defense may be established as a matter of law." *Cartier v. Lussier, 955 F.2d 841, 844 (2d Cir. 1992)*. Our review extends to whether a given factual dispute is "material" for summary judgment purposes, id., but we may not review whether a dispute of fact identified by the district court is "genuine." See *Johnson v. Jones, 515 U.S. 304, 313, 132 L. Ed. 2d 238, 115 S. Ct. 2151 (1995)*;[*10] *Salim v. Proulx, 93 F.3d 86, 90 (2d Cir. 1996)*. A "district court's mere assertion that disputed factual issues exist," however, is not "enough to preclude an immediate appeal." *Salim, 93 F.3d at 89*. Rather, we have jurisdiction to review a denial of qualified immunity to the extent it can be resolved "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." Id.

False Arrest Claim

[HN2] To establish a claim for false arrest under *42 U.S.C. § 1983*, a plaintiff must show that "the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)*. Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff. Id. Probable cause to arrest exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the[*11] belief that the person to be arrested has committed or is committing a crime." Id.

[HN3] Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was "arguable probable cause" to arrest. Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino, 950 F.2d at 870*; see also *Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002)* (stating that "in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity.") (citations omitted); *Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000)*. Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; "arguable probable cause" will suffice to confer qualified immunity for the arrest.

(1) Lunn

Escalera argues[*12] that the district court properly held that Lunn lacked objective reasonableness in effecting the arrest in light of the misstatements and omissions contained in the warrant application. To succeed in this challenge, [HN4] Escalera must demonstrate that the misstatements and omissions were "'necessary to the finding of probable cause'" *Golino, 950 F.2d at 870* (quoting *Franks v. Delaware, 438 U.S. 154, 156, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978))*. The district court failed to make this determination, which is a mixed question of law and fact, id., and implicates what, in this circuit, has come to be known as the "corrected affidavits doctrine." Under this doctrine, we look to the hypothetical contents of a "corrected" application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law. See *Loria v. Gorman, 306 F.3d 1271, 1289 (2d Cir. 2002)*; *Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999)*; see also *Franks, 438 U.S. at 171-72*.

In performing this correcting process, [*13] we examine all of the information the officers possessed when they applied for the arrest warrant. *Martinez v. City of Schenectady, 115 F.3d 111, 115 (2d Cir. 1997)*. If there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity. Only if the corrected affidavit would not "support a reasonable officer's belief that probable cause existed" would the identified factual disputes be material to resolving the issue. See *Cartier, 955 F.2d at 845* (citation omitted).

Escalera argues that because Lunn intentionally submitted an unsworn misdemeanor complaint in order to secure an arrest warrant and failed to submit any affidavit, the Loria "corrected affidavit" analysis is not

applicable. We disagree. Our [HN5] case law is clear that "in reviewing [ ] cases on qualified immunity motions, a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of [arguable][*14] probable cause." *Martinez, 115 F.3d at 115* (quoting *Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993)*).

The "correction analysis" in this case yields an objective basis that would have supported a "reasonable officer's belief that probable cause existed." *Cartier, 955 F.2d at 845* (citation omitted). As an initial matter, although the district court characterized Lunn's application for a warrant as having been "made to appear that" Lunn "was an eyewitness and knew the facts stated therein of her own knowledge," at least one copy of the application stated that "THE ABOVE ALLEGATIONS OF FACT ARE MADE BY THE COMPLAINANT BASED UPON POLICE INVESTIGATION AND SUPPORTING DEPOSITION." n2 Moreover, even if Lunn's warrant application did falsely imply that the allegations it contained were based on Lunn's own personal knowledge, that fact would not undermine a finding of arguable probable cause because the detective's personal knowledge was not necessary to that finding. See *Loria, 306 F.3d at 1289*.

------------------Footnotes-----------------

n2 In a letter to the district court, appellants conceded that the only submission that Lunn filed in support of the warrant application was a Misdemeanor Information, a copy of which had been attached as "Exhibit K" to appellants' summary judgment motion. "Exhibit K" as provided to the Court of Appeals in the Joint Appendix contains only one page and is not signed or sworn to by Lunn. The copy of the Misdemeanor Information submitted by the plaintiff in opposition to summary judgment contained two pages: the first is identical to the copy in appellants' "Exhibit K," and the second page contains, inter alia, the qualifying statement quoted above and was signed and sworn to by Lunn. It is unclear whether appellants' letter to the district court was an acknowledgment that this discrepancy existed and a concession that Lunn, in fact, submitted only a one-page Misdemeanor Information in support of the warrant application, or, whether appellants erroneously believed that Exhibit K contained the complete 2-page Misdemeanor Information and the district court was unaware that a second page existed. As we explain above, however, even if Lunn only submitted a one-page Misdemeanor Information, that fact does not alter our corrected affidavit analysis.

-----------------End Footnotes--------------

[*15]

The issue under the corrected affidavit analysis is whether, if Lunn had included all she learned from her investigation, the application would have "supported a reasonable officer's [or magistrate's] belief that probable cause existed." *Cartier, 955 F.2d at 845* (citation omitted). We believe it would have. Lunn would have known about the alleged sexual incidents underlying the charge based on Gonzalez's statements, Blanton's corroborating statements, and circumstantial evidence. Lunn also would have been aware that Escalera allegedly threatened Gonzalez based on Gonzalez's statements, the corroborating statements of Mendoza and Morales, and circumstantial evidence.

Escalera contends that it was unreasonable for Lunn to rely on Blanton's statement because it was physically impossible for Blanton to have seen into Gonzalez's cell from her own cell. This argument, apparently accepted by the district court, relies primarily on the arbitrator's conclusion that Blanton's testimony given during the hearing, that she "could see . . . [Gonzalez's] gown rising up and down from the crack in the door" was not credible because the arbitrator's own on-site inspection "revealed[*16] that it was virtually impossible for Blanton to see through the crack between her cell door and Gonzalez's cell." The arbitrator further concluded that "it was virtually impossible to see from Blanton's cell what was occurring in Gonzalez['s] cell . . . . Her ability to see an inmate stripping and dancing for an officer is difficult to fathom."

We have no doubt that, had Blanton made the same detailed statements on December 30, 1999, that she made at the subsequent hearing, the arbitrator's conclusions would, at the least, have created a genuine dispute of material fact as to whether Lunn reasonably relied on Blanton's statement. Blanton's December 30, 1999 statement, however, asserted only that she looked through her window, saw Escalera standing in front of Gonzalez's door, and thought she saw Gonzalez naked but was not sure. The actual accuracy or veracity of this statement is irrelevant to a determination of whether Lunn had arguable probable cause. Rather, the question is whether Lunn could have reasonably relied on it. See *Bernard v. United States, 25 F.3d 98, 103 (2d Cir. 1994)*.

Escalera has adduced no evidence demonstrating that there was information [*17]available to Lunn at the time she applied for an arrest warrant that would have indicated that Blanton could not have seen the things Blanton described in her December 30, 1999 statement. Lunn testified that she substantiated Blanton's statements, in part, by entering Blanton's cell and determining that a person could see into Gonzalez's cell by looking out the window in the door of Blanton's cell. This testimony is supported by the visual schematic of the prison floor plan submitted by Escalera in opposition to summary judgment. That schematic, although prepared after the arrest warrant was issued, shows the physical layout of the cell block at the time Lunn conducted the investigation. It indicates that Blanton's cell was across the hall and diagonal to the cell occupied by Gonzalez, that the cells were approximately sixteen feet apart, and that the door to each cell had a window roughly three feet high by one foot wide. In light of this configuration, a competent officer in Lunn's position could reasonably have believed that Blanton, looking out her window, would have been able to see Escalera in the hallway outside Gonzalez's cell and see Gonzalez - at least partially - through[*18] the window in Gonzalez's cell door. Indeed, Escalera, in a deposition following the arbitration hearing, admitted that someone looking through the window in Blanton's cell could see the front of Gonzalez's cell and the cell door.

Escalera next argues that because Lunn was aware of Gonzalez's criminal and psychiatric history, Lunn should not have relied on Gonzalez's accusations to arrest him. The parties dispute the extent to which appellants knew or should have known about Gonzalez's psychiatric history at the time of Escalera's arrest. n3 Appellants' precise knowledge notwithstanding, we assume that Lunn knew that Gonzalez might not be a reliable witness. However, [HN6] knowledge of a victim witness's criminal or psychiatric history, alone, is not enough to destroy probable cause or strip officers of qualified immunity on the basis of arguable probable cause. See, e.g., United States v. Canfield, 212 F.3d 713, 720 (2d Cir. 2000)(criminal history); United States v. Ferguson, 758 F.2d 843, 849 (2d Cir. 1985)(psychiatric history). The relevant standard under arguable probable cause is whether officers of reasonable competence could disagree on whether[*19] the probable cause test was met. Golino, 950 F.2d at 870. That standard is met.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n3 Appellants argue that, at the time of the arrest, they were not aware of Gonzalez's alleged history of audio and visual hallucinations. They state that Gonzalez had told Lunn and Crisci only that she was depressed and that no other relevant medical records existed at that time. According to Gonzalez's testimony in her subsequent civil case, Crisci, at some point prior to September 12, 2000, transported her to a mental institution because she was "delirious." In addition, the medical records that Lunn, Crisci, and an assistant D.A. did or could have reviewed contained a document stating that Gonzalez had previously been prescribed Thorazine - an antipsychotic medication. Apart from these facts, the only evidence cited by Escalera regarding Gonzalez's hallucinations was testimony given by Gonzalez during her civil case concerning her mental condition. However, this subsequent testimony is irrelevant absent a showing that appellants had reason to know those facts prior to January 26, 2000. Therefore, for purposes of this appeal, we assume only the part of Escalera's version of the facts supported by relevant evidence: that defendants did or could have reviewed a document that stated that Gonzalez had been prescribed Thorazine and that Crisci may have transported a "delirious" Gonzalez to the hospital before the arrest.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

[*20]

The facts here strongly resemble those in Corona v. Lunn, which involved another § 1983 claim of false arrest that had been filed against Lunn by a corrections officer employed by the County. 2002 U.S. Dist. LEXIS 6351, 2002 WL 550963, at *7. As she had done in Corona, id., Lunn independently corroborated the essential details of Gonzalez's story by examining prison records, interviewing other witnesses and obtaining supporting depositions from them, and inspecting the premises of the Women's Unit to substantiate corroborating accounts.

Escalera next contends that Lunn's reliance on Gonzalez was unreasonable in any event given Gonzalez's inconsistent statements. He suggests that the investigation lacked sufficient depth because Lunn did not try to clarify why Gonzalez stated in her January 21, 2000 supporting deposition that Escalera saw her wearing panties, while claiming in her December 30, 1999, statement that she was clothed in pajamas. Again, [HN7] the question is not whether there were

discrepancies, even substantial discrepancies, between the victim's accounts, but whether officers of reasonable competence could disagree on whether the probable cause test was met. *Golino, 950 F.2d at 870.*[*21] More to the point, the question is whether, under the corrected affidavits analysis, disclosure of the inconsistencies in Gonzalez's statements in the warrant application would have precluded a finding of arguable probable cause. Id. (citations omitted). We conclude that the main inconsistencies stressed by Escalera-that Gonzalez began her narrative of the incident at an earlier point in time in her January 21, 2000 statement, that she asserted in one statement but not in the other that she was wearing panties and, similarly, that she asserted in one statement that she was wearing pajamas but in the other, a nightgown-were not material to a finding of probable cause. Accordingly, it was not necessary that Lunn explicitly question Gonzalez in a follow-up interview to clear up discrepancies in her story and that, at the very least, she had arguable probable cause to arrest Escalera.

Finally, Escalera argues that Lunn could not have had arguable probable cause to arrest him on the first two counts of official misconduct, which alleged that Escalera required Gonzalez to expose her breast in exchange for Tylenol on December 11, 1999. [HN8] The elements of official misconduct are the commission [*22] of an act with an "intent to obtain a benefit . . . constituting an unauthorized exercise of [his] official functions." *N.Y. Penal Law § 195.00.* On the one hand, Escalera argues that because Lunn knew that Gonzalez had panties on at all times, it was unreasonable for Lunn to believe that Escalera would obtain a "benefit" from seeing Gonzalez bend over and touch her toes. On the other hand, Escalera argues that because, according to Gonzalez's January 21, 2000 supporting deposition, Gonzalez had already voluntarily displayed full frontal nudity when Escalera first approached the cell, it was unreasonable for Lunn to believe that Escalera would have obtained a "benefit" from a further exhibition of Gonzalez's naked body.

This argument both strains credulity and misses the point. Escalera's subjective intent and whether he actually obtained a benefit from his alleged acts are irrelevant. The issue is not whether Escalera was, in fact, innocent; rather, it is whether all of the information known to Lunn would have given rise to arguable probable cause to arrest him for official misconduct. Through her investigation, Lunn learned that Escalera, while acting[*23] in his official capacity, allegedly asked Gonzalez to engage in the humiliating act of removing her clothes in exchange for Tylenol.

We believe that if a corrected affidavit containing all of the information known to Lunn had been submitted in support of a warrant application, officers of reasonable competence could disagree whether there was probable cause to arrest Escalera. Although the affidavit would have disclosed Gonzalez's criminal and psychiatric history and the discrepancies in Gonzalez's two sworn statements, it also would have revealed that: multiple witnesses corroborated Gonzalez's statement, Lunn's physical inspection of Blanton's cell substantiated Blanton's assertion that she saw Escalera in front of Gonzalez's cell and thought she saw Gonzalez, and prison records corroborated key details of Gonzalez's allegations. Because a corrected affidavit would have "supported a reasonable officer's belief that probable cause existed," Lunn was entitled to summary judgment on the basis of qualified immunity. *Cartier, 955 F.2d at 845* (citation omitted).

(2) Crisci

Escalera argues that the district court correctly found that defendant Crisci's preparation[*24] of a "doctored" transcript and the County's attempt to introduce that transcript at the arbitration undermined Crisci's veracity and cast doubt on all of the information relied upon by the officers to arrest Escalera. In investigating the allegation that Escalera had threatened several women on the E Block, Crisci interviewed Maria Morales. While she had confirmed in a supporting deposition that Escalera had threatened Gonzalez in the early morning hours of December 31, 1999, Morales subsequently denied that Escalera had threatened Morales. This denial was omitted when Crisci transcribed the tape recorded conversation for purposes of the arbitration. Crisci was later taken to task by the arbitrator for his "calculated deceit."

However, neither Crisci's actions nor the arbitrator's subsequent criticism are relevant to the probable cause inquiry because appellants did not rely on the doctored transcript in seeking the arrest warrant. What is relevant, however, is Crisci's knowledge at the time of Escalera's arrest. Moreover, even accepting Morales's assertion that Morales was not being threatened when Escalera woke her up at 4:30 in the morning and yelled at her, it would have no bearing[*25] on whether Crisci and Lunn had probable cause to believe that Escalera had threatened her co-inmate, Gonzalez. Morales's January 13, 2000 supporting deposition, Mendoza's January 7, 2000 supporting deposition and Gonzalez's own account plainly supported a reasonable belief that Escalera had threatened Gonzalez. Accordingly, like Lunn, Crisci was entitled to qualified immunity because of the existence of arguable probable cause, notwithstanding his allegedly dishonest conduct subsequent to Escalera's arrest. n4

---------------Footnotes---------------

n4 We further note that a police officer can only be liable for a false arrest that occurs outside of his presence if he "had reason to know" that such a false arrest was likely to occur. *Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)*. Here, both parties agree that Crisci was not physically present when Escalera was arrested. Thus, because Escalera's arrest by Lunn was not a false arrest under (at the very least) an "arguable probable cause" standard, it follows that if Lunn is not liable for violating Escalera's rights, Crisci cannot be liable.

---------------End Footnotes---------------

[*26]

(3) Pozzi

Appellants argue that Pozzi cannot be held liable for Escalera's arrest because he had no personal involvement in Escalera's arrest and Escalera has failed to establish a departmental practice or policy of falsely arresting corrections officers. We agree.

In denying qualified immunity to Pozzi, the district court found that, in light of two separate cases in which corrections officers had filed false arrest claims against the County, a jury could find that Escalera had established an unconstitutional departmental practice or custom. There is no basis for such a finding. The first case relied on by the district court, *Cobb v. Pozzi, 20 Fed. Appx. 62, 2001 WL 1182775 (2d Cir. 2001)* (table decision), involved allegations that disciplinary charges were filed against plaintiff officers as punishment for their union membership, not for an alleged false arrest based on official misconduct; indeed the plaintiff officers were never arrested or criminally charged. The second case, *Corona v. Lunn, 2002 U.S. Dist. LEXIS 6351, 2002 WL 550963, at \*6*, supports the appellants' position. There, we affirmed summary judgment in favor of the defendant officers on qualified[*27] immunity grounds because probable cause to arrest existed. *Corona, 2002 U.S. Dist. LEXIS 6351*.

On appeal, Escalera does not dispute these points and offers no additional evidence that would suggest a policy of unfounded arrests. Accordingly, we reverse the denial of qualified immunity for Pozzi.

(4) The County

Although the district court's denial of the County's motion for summary judgment would not, by itself, be immediately appealable, see *San Filippo v. U.S. Trust Co., 737 F.2d 246, 255 (2d Cir. 1984)*, [HN9] "once we have taken jurisdiction over one issue in a case we may, in our discretion," exercise pendent appellate jurisdiction over related issues. *Freeman v. Complex Computing Co., 119 F.3d 1044, 1049 (2d Cir. 1997)*. On this interlocutory appeal, we have determined that, at the least, arguable probable cause to arrest Escalera existed, entitling the individual defendants to qualified immunity with respect to Escalera's false arrest claim. In the interest of judicial economy and because no additional inquiry or analysis is necessary to dispose of the false arrest claim against the County, we choose to exercise pendent jurisdiction [*28]and hold that, because each of the individual defendants had arguable probable cause, the County is likewise entitled to summary judgment in its favor. See *McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 281-82 (2d Cir. 1999)* (granting summary judgment to institutional defendant where evidence failed to establish basis for claim against individual defendants).

III. CONCLUSION

We reverse the district court's denial of summary judgment with respect to Escalera's false arrest claim and remand with instructions to the district court to enter judgment in favor of defendants on that claim. Defendants conceded at oral argument that they were not challenging denial of summary judgment in the malicious prosecution claim; the appeal is to that extent dismissed.