SUPPLY & BUILDING COMPANY, Plaintiff, - v. - ESTEE LAUDER
INTERNATIONAL, INC., Defendant.

95 Civ. 8136 (RCC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1999 U.S. Dist. LEXIS 3978

March 30, 1999, Decided
March 31, 1999, Filed

DISPOSITION: [*1] EL's motion for summary judgment on S&B's claims granted in
part and denied in part. S&B's motion for summary judgment on EL's claims
granted.

CASE SUMMARY

PROCEDURAL POSTURE:  Defendant moved for summary judgment on plaintiff's claims
for wrongful termination and breach of the covenant of good faith and fair
dealing arising from defendant's termination of the parties' cosmetics
distribution agreement. Plaintiff moved for summary judgment on defendant's
counterclaim for breach of contract.

OVERVIEW:  Defendant, a New York corporation that manufactured and supplied
cosmetics, terminated its distribution agreement with plaintiff, a Kuwaiti
company. Plaintiff filed suit alleging wrongful termination and other claims.
Defendant counterclaimed for breach of certain buy back agreements. Both parties
moved for summary judgment. As an initial matter, the court determined that New
York law governed the case. The court then granted in part and denied in part
defendant's motion and granted plaintiff's motion. The court dismissed
plaintiff's wrongful termination claim as a matter of law, concluding that
defendant properly exercised the at-will termination clause in the distribution
agreement. However, the court concluded plaintiff's breach of the covenant of
good faith and fair dealing claim could not be decided on a summary judgment
motion because the claim raised issues fraught with material issues of fact. The
court dismissed defendant's breach of contract counterclaims, concluding that
defendant had failed to demonstrate that plaintiff did not produce the goods
subject to the buy back agreements and concluding that an accord and
satisfaction occurred with respect to the buy backs.

OUTCOME:  The court granted in part and denied in part defendant's motion for
summary judgment, concluding that plaintiff's wrongful termination claim should
be dismissed as a matter of law but that plaintiff's breach of the covenant of
good faith and fair dealing claim raised material issues of fact.  The court

granted plaintiff's motion for summary judgment, concluding that defendant had failed to demonstrate a breach of the parties' buy back agreements.

CORE TERMS:  termination, choice of law, terminate, accord and satisfaction, distributor, counterclaim, buy, termination clause, summary judgment, terminated, inventory, retailers, unsold, matter of law, summary judgment motion, tortious interference, business relations, prima facie tort, designated, new agreement, travel agent, fraud claim, cause of action, merchandise, promotional, repurchase, termination provision, wrongful termination, breach of contract, causes of action

LexisNexis(R) Headnotes Hide Headnotes

Civil Procedure: Jurisdiction: Diversity Jurisdiction
Civil Procedure: State & Federal Interrelationships: Choice of Law
    [HN1] A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits including that state's choice of law rules.

Civil Procedure: State & Federal Interrelationships: Choice of Law
Contracts Law: Contract Conditions & Provisions: Conditional Duties Generally
    [HN2] In matters regarding the validity, construction, or effect of a contract in New York involving $ 250,000 or more, N.Y. Gen. Oblig. Law a 5-1401 (1989) prescribes that the parties to a contract may agree that New York State law shall govern their rights and duties whether or not such contract bears a reasonable relation to New York. If the requirements of a 5-1401 are met, the choice of law provision is given binding effect. And a 5-1401 must be applied retroactively to contracts formed before the date of its enactment. Furthermore, the legislative history of a 5-1401 indicates that public policy favors New York courts retaining lawsuits where New York is the designated forum.

Civil Procedure: Summary Judgment: Summary Judgment Standard
    [HN3] Summary judgment is mandated when there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Nevertheless, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Moreover, conclusory allegations will not suffice to create a genuine issue.

Contracts Law: Contract Conditions & Provisions
Business & Corporate Entities: Franchises & Distributorships: Terminations
    [HN4] Under New York law, parties may contract to allow one party to

unilaterally terminate a distributorship agreement without cause.

Contracts Law: Contract Conditions & Provisions

[HN5] Under New York law, if a party has a contractual right to take an action, the court may not inquire into that party's motive for exercising that right.

Civil Procedure: Preclusion & Effect of Judgments: Law of the Case Doctrine

[HN6] According to the doctrine of "law of the case," a decision regarding an issue of law made at one stage of a litigation becomes binding precedent to be followed in subsequent stages of the same litigation.

Torts: Business & Employment Torts: Deceit & Fraud

[HN7] To prove fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance. The mere additional allegation that the contracting party did not intend to meet its contractual obligation or made intentionally false statements indicating an intent to continue performance does not state a cause of action for fraud.

Torts: Business & Employment Torts: Deceit & Fraud

[HN8] In order to maintain a fraud action, the plaintiff must either: demonstrate a legal duty separate from the duty to perform under the contract; demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

Contracts Law: Types of Contracts: Implied-in-Law Contracts

[HN9] Under New York law, the existence of a valid contract governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter.

Torts: Intentional Torts: Prima Facie Tort

[HN10] Under New York law, the elements for a cause of action for prima facie tort are: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful. Additionally, the plaintiff must allege that the defendant's sole motivation was disinterested malevolence. In other words, the sole motivation for the damaging acts is a malicious intention to injure the plaintiff. Furthermore, when there are other motives, such as profit, self-interest, or business advantage, there is not recovery under the doctrine of prima facie tort.

Contracts Law: Performance: Accord & Satisfaction

[HN11] The defense of accord and satisfaction is permitted to bar further litigation if the parties agreed to satisfy all existing claims by means of a substituted performance. The moving party must establish that the parties agreed that the transactions in question constituted an accord and satisfaction and that the performance rendered by the opponent was sufficient consideration for a discharge.

Contracts Law: Performance: Accord & Satisfaction

[HN12] In appropriate instances, the acceptance by one party of benefits offered in settlement by the other will give rise to an inference that the differences have been settled by the proffered agreement. Although this analysis requires an inquiry into the parties' expressions of intent, which generally is a question of fact, if there is no genuine dispute as to the parties' intention, the question may be determined as a matter of law.

Torts: Business & Employment Torts: Deceit & Fraud

[HN13] To prove fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.

Business & Corporate Entities: Franchises & Distributorships: Causes of Action: Interference With Business Relations

[HN14] In order to succeed on a claim for tortious interference with business relations, a plaintiff must demonstrate: that it had business relations with a third party; that the defendant knew of these relations and intentionally interfered with them; that the defendant's sole purpose was to harm the plaintiff or that the defendant used dishonest, unfair or improper means; and that there was injury to the plaintiff's business relationship with the third party.

COUNSEL: For SUPPLY & BUILDING COMPANY, plaintiff: Joseph D. Pizzurro, Curtis, Mallet-Prevost, Colt & Mosle, New York, NY.

For ESTEE LAUDER INTERNATIONAL, INC., defendant: Fredric W. Yerman, Kaye Scholer Fierman Hays & Handler, NY, NY.

JUDGES: Richard Conway Casey, United States District Judge.

OPINIONBY: Richard Conway Casey

OPINION: Opinion and Order

Richard Conway Casey
United States District Judge

   Plaintiff Supply & Building Company (hereinafter S&B) sues Estee Lauder International, Inc. (hereinafter EL) for wrongful termination of its distributor contract with S&B, as well as for various pretermination causes of action. EL countersues for breach of the distributor contract, and for various other post termination causes of action. Jurisdiction is based on diversity of citizenship. See 28 U.S.C. a 1332. Both parties move for summary judgment pursuant to Fed. R. Civ. P. 56.

   I. BACKGROUND

   EL, a New York corporation whose principal place of business is New York, is engaged in the manufacturing and supplying of high quality cosmetics. S&B is a [*2]Kuwaiti company with its principal place of business in Kuwait. S&B was EL's sole distributor in Kuwait until their relationship was terminated in December of 1994. EL and S&B are parties to a distribution agreement (hereinafter the Agreement or 1968 Agreement) which has been operative since 1968. The Agreement designated New York as the forum for all dispute resolution and as the choice of law for arbitration, but designated "the Laws of the United States" as its choice of law for dispute resolution in general.

   The parties appeared to have a mutually beneficial relationship until Iraq invaded Kuwait in 1990. In the aftermath, their relationship deteriorated ending with EL sending S&B a timely notice of termination on September 20, 1994. n1 Soon thereafter, S&B requested that EL buy back certain of the products S&B had received from EL before it learned of the termination.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

   n1 The Agreement, which was automatically renewable annually, required EL to give S&B 30 days notice of termination for cause and 60 days notice for termination without cause. Although S&B characterizes the termination as "for cause," after reviewing the letter from EL's notice of termination to S&B dated September 20, 1994, the Court finds that the letter made clear that EL was exercising the at will termination clause in the Agreement.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*3]

   The Agreement gave EL the right to buy back certain of the unsold products and promotional materials in S&B's possession at the time of the termination. From November 1994 to June 1995 the parties negotiated the terms of the repurchase, which involved three inspections of S&B's inventory by EL's auditor, Arthur Andersen. On June 14, 1995, EL agreed to pay S&B approximately $ 504,216 for "products and promotional materials on hand as of the 1968 Agreement's

termination, plus additional products which represent returns occurring after the termination date." See Pizzurro Aff., Ex. 30.

On September 22, 1995, S&B filed this action seeking damages for wrongful termination, as well as damages for pretermination breaches of the Agreement, including breach of the covenant of good faith and fair dealing, fraud, unjust enrichment, and prima facie tort. EL countersued for damages relating to S&B's breach of its obligation to resell certain of its goods at a predetermined price after it was terminated. EL also sued S&B for fraud, related to the buyback, and for tortious interference with business relations, related to EL's new distributor's grand opening.

During that same period, beginning[*4] in January 1995, S&B's retailers began returning EL's products to S&B for credit because they did not want to carry EL's products once they learned that EL had terminated its distributorship contract with S&B. In October 1995, EL moved for a preliminary injunction by order to show cause (hereinafter the October hearing) to enjoin S&B from reselling the returned EL merchandise. However, at the hearing, EL represented that it was willing to buy back that merchandise. Thus, EL was permitted to withdraw its claim with leave to replead so that the parties could negotiate a buy back for the returned products as well. That agreement was settled in November 1995 (hereinafter the November Agreement).

II. DISCUSSION

In October 1998, Judge Sotomayor n2 ordered the parties to provide supplemental briefs on the issue of whether the substantive law of New York or Kuwait governs this action. Thus, the Court must first resolve the choice of law issue before addressing the summary judgment motion.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Judge Sotomayor was appointed to the Second Circuit Court of Appeals, and this case was transferred to me.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*5]

A. Choice of Law

[HN1] A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits, including that state's choice of law rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021-1022, 85 L. Ed. 1477 (1941); Sheldon v. PHH Corp., 135

F.3d 848, 852 (2d Cir. 1998).        [HN2] In matters regarding the validity,
construction, or effect of a contract in New York involving $ 250,000 or more,
section 5-1401 of the New York General Obligations Law prescribes that the
parties to a contract "may agree that . . . [New York State law] . . . shall
govern their rights and duties . . . whether or not such contract . . . bears a
reasonable relation to . . . [New York]." N.Y. Gen. Oblig. Law @ 5-1401(1)
(McKinney 1989). If the requirements of section 5-1401 are met, the choice of
law provision is given binding effect. See Philips Credit Corp. v. Regent
Health Group, Inc., 953 F. Supp. 482, 502 (S.D.N.Y. 1997). And section 5-1401
must be applied retroactively to contracts formed before the date of its
enactment. See Babcock & Wilcox Co. v. Control Components, 161 Misc. 2d
636, 641, 614 N.Y.S.2d 678, 682 (N.Y. [*6] Sup. Ct. 1993). Furthermore, the
legislative history of section 5-1401 indicates that "public policy favors New
York courts retaining lawsuits where New York is the designated forum."
Philips Credit, 953 F. Supp. at 502 (quoting Babcock, 161 Misc. 2d at 641,
614 N.Y.S.2d at 682 (internal quotes omitted)); see also J. Zeevi and
Sons, Ltd. v. Grindlays Bank (Uganda) Limited, 37 N.Y.2d 220, 227, 371 N.Y.S.2d
892, 899, 333 N.E.2d 168 (1975).

    Here, because S&B has made claims for damages that run well into the millions
of dollars, the monetary requirement of section 5-1401 is met. However, S&B
argues that New York law was not the choice of law for the 1968 Agreement,
because the Agreement specified that "the Laws of the United States" would apply
to any disputes arising under the Agreement. Thus, the Court must first
determine whether the Agreement's failure to designate New York explicitly for
its choice of law defeats application of section 5-1401.

    S&B argues that "the Laws of the United States" is an ambiguous term that
cannot be construed to mean "New York." As S&B argues, whenever two possible
interpretations of a contract seem equally possible, the language will be
construed[*7] against the party that drafted it. Here, no party disputes that EL
was the drafter of the agreement. Nevertheless, the phrase "the Laws of the
United States" is not ambiguous when viewed in context. See e.g., CPS
International Inc. v. Dresser Industries, Inc., 911 S.W.2d 18, 25-27 (Tex.
App.-El Paso 1995). In CPS, the Texas Court of Appeals held that the parties'
designation of the "Laws of the United States of America" as their choice of law
should be construed as designating Texas as their choice of law, despite
substantial contacts with Saudi Arabia. The court reasoned that only Texas law
could be the parties' choice of law, because Saudi law was not one of the "Laws
of the United States," and no American State other than Texas had any relation
to the contract.  CPS, 911 S.W.2d at 27 n.7. See also Transamerica
Interway, Inc. v. Commercial Union Assur. Co. of South Africa, Ltd., 97 F.R.D.
419, 423 (S.D.N.Y. 1983) (holding that the "law of the United Kingdom," which
does not exist, should be construed to mean English law because the court was
"sure at least that the parties did not want American law (state or federal) to
govern their policies"). In this case, there[*8] is no doubt that the parties
did not want Kuwait law, or any other foreign law, to be their choice of law,

given their use of the phrase "Laws of the United States" for their contract's choice of law provision -- a provision that has been left untouched since 1968. n3 And no party argues that any state in America other than New York State had any meaningful contacts to this contract. Furthermore, the Agreement designated New York as the forum for dispute resolution, including arbitration. Finally, S&B relied exclusively on New York case law for its opposition to EL's summary judgment motion on S&B's claims, for its summary judgment motion against EL's counterclaims, and in all of its letters to this court. See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 137 (2d Cir. 1991); Tehran-Berkeley Civil and Environmental Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989); Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52-53 (2d Cir. 1984).

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

    n3 Even if the phrase, "the Laws of the United States" is ambiguous, S&B has failed to demonstrate that an equally plausible meaning of that phrase would implicate Kuwait law for the Court to construe the ambiguity in favor of S&B. Furthermore, although Kuwaiti law at the time of the formation of the Agreement allowed at will termination contractual provisions, current Kuwaiti law prohibits at will termination provisions. Thus, application of Kuwaiti law would be inadvisable because "it will usually be presumed that the parties to a contract contemplate the application of a law which would uphold the contract, and it cannot be presumed that they intended to submit to a jurisdiction whose law would defeat it." See B.M. Heede, Inc. v. West India Machinery and Supply Co., 272 F. Supp. 236 (S.D.N.Y. 1967) (citing Pritchard v. Norton, 106 U.S. 124, 1 S. Ct. 102, 27 L. Ed. 104 (1882)).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*9]

    After considering all the above factors, the Court is convinced that the 1968 Agreement designated New York for its choice of law. Accordingly, under section 5-1401, New York law shall govern this action.

    B. Summary Judgment Motions

        [HN3] Summary judgment is mandated when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994). Nevertheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Moreover, "conclusory allegations will not suffice to create a genuine issue." Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,[*10] 902 F.2d 174, 178 (2d Cir. 1990).

i) S&B's Wrongful Termination Claim

[HN4] Under New York law, parties may contract to allow one party to unilaterally terminate a distributorship agreement without cause. See Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, 110, 611 N.Y.S.2d 533, 534 (App. Div. 1st Dep't 1994) (citing A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 382, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957)). In this case, the Agreement was automatically renewable annually, unless a timely notice of termination was provided. Under the Agreement, to terminate S&B without cause, EL was required to give S&B 60 days notice. EL gave S&B over 100 days notice of termination. Moreover, the time limit of 60 days is more than adequate to uphold the termination provision as providing sufficient notice to the terminated party.

Despite the clear at will termination provision in the Agreement, S&B sets forth three reasons why EL should be held liable for terminating S&B without cause: equitable estoppel; breach of fiduciary duty; and, modification by conduct of the at will termination provision.

S&B argues that equitable estoppel precludes EL from relying on the at will termination[*11] clause because during the time that EL secretly intended to terminate its relationship with S&B, EL's representations and conduct caused S&B to believe that it would not be terminated. In other words, S&B would not have labored to rebuild its business after Iraq's invasion if it knew that EL planned to terminate the Agreement. However, EL cannot be estopped from exercising the Agreement's explicit at will termination clause merely because EL encouraged S&B to continue performing its obligations while EL acted to ensure its financial security. Furthermore,      [HN5] under New York law, "if a party has a contractual right to take an action, the court may not inquire into that party's motive for exercising that right." Kerns v. Wella Corporation, 114 F.3d 566, 570 (6th Cir. 1997) (applying New York law in upholding defendant manufacturer's termination of distributor) (citing Fry v. McCall, 945 F. Supp. 655, 667 (S.D.N.Y. 1996)). In this case, the Agreement contains an explicit termination clause that expressly provides for termination without cause. Because EL relied on that clause in its termination of S&B within the prescribed time limits, S&B's defense of equitable estoppel fails. [*12]

Regarding S&B's argument that EL could not terminate S&B without cause

because it owed S&B a fiduciary duty, Judge Sotomayor, explicitly prohibited S&B from raising that theory when she denied S&B's motion to amend its complaint. Specifically, she found that EL would be materially prejudiced because three years had passed since the commencement of this action before S&B raised this issue, and to allow the breach of fiduciary duty theory would require a substantial increase in discovery. See transcript from March 27, 1998 hearing. Furthermore,      [HN6] according to the doctrine of "law of the case," a decision regarding an issue of law made at one stage of a litigation becomes binding precedent to be followed in subsequent stages of the same litigation. See Scottish Air Intern., Inc v. British Caledonian Group, PLC., 152 F.R.D. 18, 24 (S.D.N.Y. 1993) (citing DiLaura v. Power Authority of N.Y., 982 F.2d 73, 76 (2d Cir. 1992)). Accordingly, S&B is barred from raising this issue.

    Finally, S&B argues that EL modified the Agreement by its course of conduct, and therefore cannot rely on the at will termination clause. S&B cites the in apposite Care Travel Co. Ltd. v. Pan American World [*13]  Airways, Inc., 944 F.2d 983 (2d Cir. 1991), in support of its position. Care Travel affirmed a jury verdict in favor of a distributor who was terminated pursuant to an at will termination clause. However, unlike the case at bar, Care Travel involved a mutual exchange of promises related to the termination clause. In that case, the defendant airline Pan Am promised the plaintiff travel agent Care Travel that it would not terminate it if Care Travel would permit Pan Am to use another travel agent for a limited duration. In exchange for Care Travel's promise to allow Pan Am to use another travel agent, Pan Am agreed to terminate the other travel agent, and also promised not to terminate Care Travel. Thus, both parties to the contract agreed to the modification by exchanging promises. Here, the reverse is true. S&B argues that EL implicitly promised not to terminate S&B, because EL forced S&B to perform oppressive tasks that were not explicitly required under the Agreement. However, the fact that S&B may have agreed to act in a manner that was not required under the Agreement does not amount to a promise by EL that it would not terminate S&B. In fact, S&B claims that the subject[*14] of a new agreement was raised, but no new agreement was ever made. See Pl. Brf. at 20. Moreover, the letter that S&B claims evidences EL's intent to enter into a new agreement expressly states that no new agreement would be binding until it was in writing. Thus, the 1968 Agreement was still in effect at the time of termination, and S&B's claim that the Agreement was modified fails. n4

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

    n4 Because the Agreement was in writing, the Statute of Frauds would also appear to bar an implied modification absent some form of writing. See N.Y. Gen. Oblig. L. @ 5-701.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Accordingly, S&B's first and second causes of action for wrongful termination must be dismissed as a matter of law, because EL properly exercised the at will termination clause under the 1968 Agreement.

ii) S&B's Pretermination Claims

a) Breach of the Covenant of Good Faith and Fair Dealing

S&B's third cause of action claims that EL breached its implied covenant of good faith and fair dealing by: failing to ship its cosmetics to S&B according to[*15] its obligations under the Agreement; failing to provide S&B with adequate training for its staff in Kuwait; and, failing to provide adequate advertising support in Kuwait. EL argues that the Agreement designates S&B as the party solely responsible for training and advertising, and that its shipment of cosmetics was more than adequate. Because these issues are fraught with material issues of fact, they cannot be decided on a summary judgment motion. Therefore, EL's motion for summary judgment on S&B's third cause of action must be denied.

b) S&B's Fraud Claim

S&B's fraud claim asserts that EL's representation that it was not planning to terminate S&B caused S&B to incur additional expenses in reliance on that representation. However, breach of a promise not to terminate sounds in contract, not fraud.     [HN7] To prove fraud under New York law, a "plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57[*16] F.3d 146, 153 (2d Cir. 1995). The mere additional allegation that the contracting party did not intend to meet its contractual obligation or made intentionally false statements indicating an intent to continue performance does not state a cause of action for fraud. See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 19-20 (2d Cir. 1996) (citing cases). In Bridgestone, the defendant collection agencies misrepresented that they intended to remit all sums due the plaintiffs. In holding that the fraud claim was really a disguised breach of contract claim, the court noted that intentionally lulling the plaintiff into a false sense of security that it would be paid, even if that false security caused the plaintiff detriment, did not amount to fraud. The court further held that     [HN8] in order to maintain a fraud action under circumstances similar to the case at bar, the plaintiff must either: demonstrate a legal duty separate from the duty to perform under the contract; demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or, seek special damages that are caused by the misrepresentation and unrecoverable as contract damages. [*17] See Bridgestone, 98 F.3d at 19-20 (citations

omitted). See also Comtomark, Inc. v. Satellite Communications Network, Inc., 116 A.D.2d 499, 497 N.Y.S.2d 371 (N.Y. App. Div. 1986); Paper Corp. of U.S. v. Schoeller Technical Papers, Inc., 759 F. Supp. 1039, 1044-45 (S.D.N.Y.1991) (holding that "a claim for fraud will be dismissed when the only fraud charge relates to a breach of contract") (citing Trusthouse Forte (Garden City) Management, Inc. v. Garden City Hotel, Inc., 106 A.D.2d 271, 483 N.Y.S.2d 216, 218 (N.Y. App. Div. 1984)). Here, S&B fails to satisfy any of the above elements. Accordingly, S&B's claim for fraud is dismissed.

   c) S&B's Claim for Unjust Enrichment

   S&B also claims that EL has been unjustly enriched because S&B expended resources and time to rebuild its business in Kuwait, and was not compensated for those efforts, because defendant withheld shipment of all the merchandise for which plaintiff was creating a demand.     [HN9] Under New York law, the existence of a valid contract governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter. See Clark-Fitzpatrick, Inc. v. Long Island R.R., 70 N.Y.2d[*18] 382, 388-389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). Here, the Agreement covers the subject matter of this claim, and therefore this claim must be dismissed as a matter of law. See Valley Juice Ltd. v. Evian Waters of France, Inc., 87 F.3d 604, 606 (2d Cir. 1996).

   d) S&B's Claim for Prima Facie Tort

     [HN10] Under New York law, the elements for a cause of action for prima facie tort are: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful. Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 332-33, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459 (1983). Additionally, the plaintiff must allege "that defendants' sole motivation was 'disinterested malevolence.'" Id. "In other words, the sole motivation for the damaging acts must have been a malicious intention to injure the plaintiff." Marcella v. ARP Films, Inc., 778 F.2d 112, 119 (2d Cir. 1985). Furthermore, the Second Circuit has held that "when there are other motives, such as profit, self interest, or business advantage, there is not recovery under the doctrine of prima facie tort." Id. Here, [*19] taking S&B's complaint as a whole, aside from S&B's unsupported allegations that EL acted "maliciously," it is clear that motives such as profit and self interest are alleged by S&B to be part of EL's decision to terminate S&B. Accordingly, S&B's prima facie tort claim is dismissed.

   iii) EL's Breach of Contract Claims

   EL's breach of contract claims concern the June 1995 agreement (hereinafter the June Agreement) and the November Agreement. Specifically, EL disputes

whether S&B sold back all the products covered under the 1968 Agreement and the June Agreement, and complains that the goods it did buy were overpriced and, in some instances, not in "good condition." n5 S&B argues that an accord and satisfaction has occurred with respect to the buy backs, and that EL is merely attempting to renege on two agreements into which it entered freely and voluntarily.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

   n5 In its Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment on Estee Lauder's Counterclaims (hereinafter Def. Brf.), EL explains that its inclusion of S&B's alleged breach of the November Agreement is solely for the purpose of establishing its counterclaims for breach of the 1968 and June Agreements. See Def. Brf. at 12 n. 6.


- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*20]

   a) Accord and Satisfaction

   S&B offers the affirmative defense of accord and satisfaction for the first time in its moving papers. n6     [HN11] The defense of accord and satisfaction is permitted to bar further litigation if the parties agreed to satisfy all existing claims by means of a substituted performance. See Geisco, Inc. v. Honeywell, Inc., 682 F.2d 54, 57 (2nd Cir. 1982). The moving party must establish that the parties agreed that the transactions in question constituted an accord and satisfaction, and that the performance rendered by the opponent was sufficient consideration for a discharge. As the Second Circuit has explained:

The requisite agreement is not foreclosed by the plaintiff's unexpressed, subjective understanding; agreement in law arises if what was done by the defendant . . . made it unreasonable for plaintiff not to understand that defendant's performance was offered to him as full satisfaction of any claim he might have against defendant ... (citations omitted) (emphasis in original) (internal quotations omitted). See Geisco, 682 F.2d at 57.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

   n6 EL argues, under Fed. R. Civ. P. 8(c), that S&B's failure to plead accord and satisfaction in its answer waives the defense. However, accord and satisfaction may be raised for the first time on summary judgment, see e.g., May Department Stores Co. v. International Leasing Corp., Inc., 1 F.3d 138 (2d Cir. 1993), especially where the opponent is not prejudiced by surprise. Here, the facts supporting the defense of accord and satisfaction can be gleaned

from the parties submissions, and as such, do not create an unfair surprise for EL. See Dresser Indus., Inc. v. Pyrrhus AG, 936 F.2d 921, 928 (7th Cir. 1991).


- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*21]

    In other words, "     [HN12] in appropriate instances, the acceptance by one party of benefits offered in settlement by the other will give rise to an inference that the differences have been settled by the proffered agreement." Pepper's Steel & Alloys, Inc. v. Lissner Minerals & Metals, Inc., 494 F. Supp. 487, 496-97 (S.D.N.Y.1979) (citation omitted). Although this analysis requires an inquiry into the parties' expressions of intent, which generally is a question of fact, if there is no genuine dispute as to the parties' intention, the question may be determined as a matter of law. See e.g., May Department Stores, 1 F.3d at 140.

    EL argues that whether it intended the June Agreement to be an accord and satisfaction is a question of fact, and that under its interpretation of the June Agreement, S&B failed to deliver all the goods required. n7 The June Agreement's confirmation letter recounts, inter alia, that EL was purchasing EL "products and promotional materials on hand as of the 1968 Agreement's termination, plus additional products which represent returns occurring after the termination date." See Pizzurro Aff., Ex. 30. Pursuant to the June Agreement, EL received all S&B's[*22] unsold products, but only the January returned products. n8 EL claims that its buy back should have included all returned products for the months leading up to the June Agreement, rather than just January's returns. EL also claims that all returned goods should be construed as unsold goods anyway, because the returned goods were purchased on credit (the liability being eliminated upon return), and thus never "sold" in a technical sense.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

    n7 EL also contends that there can be no accord and satisfaction because S&B reserved its rights under the June Agreement and EL reserved its rights under the November Agreement. However, EL's reservation in November has no effect on the June Agreement, and S&B's reservation of its rights does not make it "unreasonable for [EL] not to understand that [S&B's] performance was offered to [EL] as full satisfaction of any claim [EL] might have against [S&B]." See Geisco, 682 F.2d at 57. Accordingly, EL's argument that S&B's reservation of its rights negates any accord and satisfaction is without merit.

    n8 Some retailers returned goods to S&B in January 1995 after Arthur Andersen accountants performed the first inventory inspection in December 1994. Once EL

was notified of the returns, Arthur Andersen performed its second inventory inspection to account for those returns which were the only returns in the first repurchase.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

[*23]

   According to S&B, there is no real evidence contradicting its position that the June Agreement covered only those unsold goods in S&B's possession at the time of termination and the January return products. S&B disputes EL's characterization of the confirmation letter because it sent EL at least three notices since May 8, 1995, requesting EL to purchase merchandise that was either returned or that would be returned imminently. According to S&B, its retailers did not want to sell EL products if EL would not continue supplying the retailers through its new distributor. Instead of inquiring about the new returns, however, EL never responded to those requests until it told the Court at the October hearing that it wanted to buy back the additional returned goods. Furthermore, on May 5, 1995, EL sent S&B a proposed receipt for full payment for all unsold products and promotional materials, yet that receipt never mentioned any returned products. Although EL was informed of the new returns on May 8, 1995, and knew that some products were being returned as early as January 1995, it failed to negotiate for those additional returns during the month before the execution of the June Agreement. [*24] Thus, EL had at least one month's notice of the additional returns before entering the June Agreement, which demonstrates that the June 14th confirmation letter only concerned the January returns.

   Finally, S&B is also alleged to have possessed either additional unsold products or additional returned products that it should have sold to EL pursuant to the June Agreement, because S&B negotiated with other companies for the purchase of EL products during the months leading up to and following the June Agreement. The deals in question involved one sale to a store in Singapore, one proposed sale to Hratch Ilanjian of Anmah Industries, and another proposed sale to a Dutch company.

   S&B disputes that its negotiations with other companies was a breach of any agreement. With respect to the Singapore sale, the goods in question were goods in the possession of retailers, not S&B. Therefore, those goods were not covered by either the 1968 Agreement or the June Agreement. Moreover, the agreements with the other companies never resulted in any actual sales. Because EL constantly delayed finalizing repurchase agreements not only with S&B, but with distributors in Saudi Arabia as well, see Pizzurro[*25] Supplemental Aff. Ex. 1 at 270-71, S&B claims that the proposed sale to Ilanjian was only a hedge against EL refusing to repurchase the returned goods. In fact, after EL eventually did purchase the returned goods, S&B immediately rescinded its offer to Ilanjian. See Pizzurro Aff. Ex. 2. Thus, any dealings S&B had with other

companies cannot be considered a breach.

Accordingly, EL has failed to demonstrate that S&B failed to produce the goods EL bargained for pursuant to the 1968 and June Agreements. n9 Moreover, because the June Agreement constituted an accord and satisfaction as a matter of law, EL's complaint that the goods it purchased from the buy back agreements were overpriced and not in good condition is without merit. Thus, EL's first and second counterclaims are dismissed.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 Because S&B satisfied its obligation under the June Agreement, the November Agreement was not breached either, because S&B rightfully bargained for the price of the goods that it sold to EL.


- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

iv) EL's Fraud Claim

EL also claims[*26] that a question of fact exists as to whether S&B made fraudulent representations to EL regarding the inventory buy back upon which EL relied to its detriment. As discussed in section (ii)(b), supra,      [HN13] to prove fraud under New York law, EL must show that (1) S&B made a material false representation, (2) S&B intended to defraud EL thereby, (3) EL reasonably relied upon the representation, and (4) EL suffered damage as a result of such reliance. Banque Arabe et International D'Investissement v. Maryland Nat'l Bank, 57 F.3d at 153. Here, EL's auditors inspected S&B's inventory on three separate occasions to inspect the quality and quantity of the goods S&B had in its possession. Moreover, S&B notified EL on several occasions of an imminent return of products from retailers. Thus, EL can not claim that it was sold goods that were not in the condition it expected, and cannot claim that it was unaware of S&B's possession of returned goods. n10 Moreover, because S&B has already demonstrated that an accord and satisfaction was reached, EL cannot prove damages for fraud. Accordingly, EL's third counterclaim is dismissed.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 It is important to note that the only representations, other than that related to the products' condition, alleged by EL under P 82 of its Answer, were made either in 1994, or were to the effect that all remaining inventory covered under the 1968 Agreement would be sold. However, the 1968 Agreement did not include returned EL products. Moreover, the June 14th commitment letter noted that EL was buying outdated products even though it was not obligated to do so. See Pizzurro Aff. Ex. 30. Thus, the alleged representations do not even appear to be materially false.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*27]

   v) EL's Claim for Tortious Interference with Business Relations

   On October 1995, EL and its new distributor held a grand opening in Kuwait
City. Diagonally across from the grand opening, a partly owned S&B store
displayed some EL products in its front windows. EL claims that S&B displayed EL
products intentionally to destroy the brand image it tried to reestablish in
Kuwait with its new supplier. Although EL fails to demonstrate how its brand
image was tarnished, and fails to demonstrate any damages as a consequence, it
has sued for tortious interference with its business relations with its new
distributor.

       [HN14] In order to succeed, EL must demonstrate: that it had business
relations with a third party; that S&B knew of these relations and intentionally
interfered with them; that S&B's sole purpose was to harm EL or that S&B used
dishonest, unfair or improper means; and, that there was injury to EL's business
relationship with the third party. See Matsushita Electronics Corp. v.
Loral Corp., 974 F. Supp. 345 (S.D.N.Y. 1997); see also Goldhirsh Group v.
Alpert, 107 F.3d 105, 108 (2d Cir. 1997). Here, EL has failed to come forward
with any evidence that S&B's sole purpose was to[*28] harm EL, nor has it
demonstrated any injury. Accordingly, EL's sixth counterclaim for tortious
interference with business relations is dismissed. n11

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

   n11 Plaintiff's remaining counterclaims for negligent misrepresentation
(fourth counterclaim), tortious interference with contractual relations (fifth
counterclaim), and prima facia tort (seventh counterclaim) were voluntarily
withdrawn by EL.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

   III. CONCLUSION

   For the reasons stated above, EL's motion for summary judgment on S&B's
claims is granted in part and denied in part. S&B's motion for summary judgment
on EL's claims is granted.

Dated: March 30, 1999

   New York, New York

SO ORDERED:

Richard Conway Casey, U.S.D.J.