# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EUGENE D'ANGELO : NO. 3:02CV1313(SRU)
    *Plaintiff,* :
     :
    VS. :
     :
KENNETH KIRSCHNER, ET AL. :
    *Defendants.* : AUGUST 31, 2005

### THE DEFENDANTS' LOCAL RULE 56(A)(1)
### STATEMENT OF FACTS NOT IN DISPUTE

    The defendants hereby submit this statement of facts as to which they contend there are no issues in dispute[1]:

---

[1]    This statement makes reference to the following documents: (1) Affidavit of Richard G. Covello dated August 22, 2005 ("Covello Aff."), attached as Exhibit A; (2) Affidavit of Kenneth H. Kirschner dated August 24, 2005 ("Kirschner Aff."), attached as Exhibit B; (3) Affidavit of William McGuire dated August 27 2005 ("McGuire Aff."), attached as Exhibit C; (4) Affidavit of Andrew Russell dated August 25, 2005 ("Russell Aff."), attached as Exhibit D; (5) Affidavit of William Kasche dated August 22, 2005 ("Kasche Aff."), attached as Exhibit E; (6) Affidavit of John Mannion dated August 25, 2005 ("Mannion Aff."), attached as Exhibit F; (7) Affidavit of Susan Revoir dated August 25, 2005 ("Revoir Aff."), attached as Exhibit G; (8) Statement of Trooper Richard Binkowski dated January 4, 1997 ("Binkowski St."), attached as H; (9) Arrest Warrant Application and Affidavit dated May 29, 1997 ("Affidavit"), attached as Exhibit I.; (10) Information dated May 29, 1997, attached as Exhibit J; (11) Arrest Warrant dated May 29, 1997, attached as Exhibit K; (12) Document entitled "Agreement Between the State of Connecticut and Section 1208 Participants" ("1208 Agreement") attached as Exhibit L; (13) Statement of Terrence Langin dated January 15, 1997 ("Langin St."), attached as Exhibit M; (14) Statement of Officer George Slaiby dated February 1, 1997 ("Slaiby St.") attached as Exhibit N; (15) Statement of William Trainham dated January 14, 1997 ("Trainham St."), attached as Exhibit O; (16) Transcript of January 7, 1997 telephone conversation between Richard Binkowski and Eugene D'Angelo ("Telephone Conversation"), attached as Exhibit P; (17) Transcript of conversation between Richard Binkowski and Eugene D'Angelo on January 9, 1997 at Northstar facility in Meriden, Connecticut ("Northstar Meeting"), attached as Exhibit Q; (18) Document entitled "1208 Program Equipment Transfer Receipt" ("Transfer Receipt") dated January 9, 1997,

1.     The plaintiff Eugene D'Angelo was a trooper employed by the Connecticut State Police ("CSP") who retired in 1998.  (Stipulation.)

2.     The defendant Kenneth Kirschner was the Commissioner of Public Safety of the Department of Public Safety for the State of Connecticut.   (Kirschner Aff., ¶ 2.)

3.     The defendant John Mannion held the rank of lieutenant in the CSP and commanded the Central District Major Crime Squad.  (Mannion Aff., ¶ 2.)

4.     The defendant Richard Covello held the rank of major during the events in question.  He supervised the Bureau of Criminal Investigations Unit of the CSP.  (Covello Aff., ¶ 4.)

5.     The defendant Edward Kasche held the rank of lieutenant during the events in question.  He was assigned to the Bureau of Criminal Investigations Unit of the CSP during the events in question.  (Kasche Aff., ¶ 4.)

6.     The defendant Andrew Russell held the rank of sergeant during the events in question.  He was assigned to the Bureau of Criminal Investigations Unit of the CSP.  (Russell Aff., ¶ 3.)

---

attached as Exhibit R; (19) Statement of Pasquale DiChello dated May 27, 1997 ("DiChello St.") attached as Exhibit S; (20) Deposition of Eugene D'Angelo on June 2, 2004 ("D'Angelo Dep."), attached as Exhibit T; (21) Deposition of John Mannion on May 12, 2005, attached as Exhibit U; (22) Deposition of Michael Dearington on May 12, 2005 ("Dearington Dep."), attached as Exhibit V; (23) Stipulation between Eugene D'Angelo and the Department of Public Safety dated March 12, 1998 ("Stipulation"), attached as Exhibit W; (24) Transcript of hearing before Superior Court on July 15, 1999 in State v. D'Angelo, CR97-181227 ("Hearing"), attached as Exhibit X; (25) Notice of Internal Affairs Investigation ("Notice"), attached as Exhibit Y; (26) Inventory of Property Seized Without a Search Warrant dated January 14, 1997 ("Inventory"), attached as Exhibit Z; and (27) Document entitled "Items Provided to CT. State Police" ("State Police Inventory"), attached as Exhibit AA.

7.      The defendant William McGuire was a Lt. Colonel in the CSP.  (McGuire Aff. ¶ 2.)

8.      While in the employ of the CSP, the plaintiff was responsible for the Connecticut operations of a federal program called "The Northstar Program."  In this program, surplus federal military equipment was distributed to various state agencies.  (D'Angelo Dep., p. 88.)

9.      Pursuant to the Northstar Program, state and local police departments had a "screener" who would request material that would be used for that department's needs.  Material that was provided via Northstar was to be used only for law enforcement purposes.  (1208 Agreement.)

10.     The Connecticut operation of Northstar was run out of the CSP's Altobello complex in Meriden, Connecticut.  The plaintiff was the "screener"  for the CSP and from time to time travel to federal military bases to obtain surplus material for the Connecticut operation of Northstar.

11.     In early 1997, Major Covello heard rumors that the plaintiff was trading Northstar property for personal benefit.  He also heard that Trooper Binkowski of the CSP had first-hand knowledge of the plaintiff's alleged wrongdoing.  He reported this to Commissioner Kirschner. (Covello Aff., ¶ 5.)

12.     Commissioner Kirschner asked Major Covello to investigate this matter. Major Covello assigned Lt. Kasche and Sergeant Russell to interview Trooper Binkowski.  Both Lt. Kasche and Sergeant Russell were members of the Bureau of Criminal Investigations Unit. They took a statement from Trooper Binkowski.  (Covello Aff., ¶ 6.)

13.    Trooper Binkowski was the resident trooper of Woodbury and in that capacity supervised Woodbury's constables.  He was the screener for Woodbury.  (Binkowski St.)

14.    Based on the statement of Trooper Binkowski, Major Covello had reason to believe that the plaintiff was engaged conduct that appeared to violate the code of conduct of the Connecticut State Police.  (Covello Aff., ¶ 7)

15.    Trooper Binkowksi informed Lt. Kasche and Sgt. Russell that he had a telephone conversation during which Mr. D'Angelo offered to trade him Northstar material for personal property.  (Covello Aff., ¶ 8.)

16.    Based on the above, Major Covello authorized Lt. Kasche and Sgt. Russell to provide Trooper Binkowski with a microcassette recorder to tape phone conversations between Binkowski and the plaintiff in which such a trade might be discussed.  (Covello Aff., ¶ 8.)

17.    Such a telephone conversation was recorded on January 7, 1997.  In that conversation it appeared that the plaintiff offered to meet Trooper Binkowski at the Northstar facility in Meriden to exchange Northstar property for property owned by Trooper Binkowski.  (Covello Aff., ¶ 9.)

18.    Major Covello authorized the CSP personnel to tape and monitor the meeting, which took place on January 9, 1997.  During this meeting, the plaintiff offered to trade Northstar material for Trooper Binkowski's personal property.  (Covello Aff., ¶ 11.)

19.    On January 12, 1997, Major Covello reported to Commissioner Kirschner and advised him of what he had learned concerning the plaintiff's ongoing conduct.  At this meeting, which was also attended by Sgt. Russell and Lt. Kasche, Commissioner Kirschner transferred the

investigation to Major Crimes Unit ("Major Crimes"), which was commanded by Lt. Mannion. (Covello Aff., ¶ 12.)

20.     After Commissioner Kirschner transferred the investigation to Major Crimes, members of Major Covello's staff turned over their complete file to Major Crimes.  Neither Major Covello, Lt. Kasche, Sgt. Russell or anyone under Major Covello's supervision had any further involvement in the criminal investigation. (Covello Aff., ¶ 13.)

21.     Major Covello did not apply for a search warrant to search the plaintiff's personal residence on or about January 13, 1997, or at any other time.  (Covello Aff., ¶ 12.)

22.     On January 23, 1997, CSP Detective Edward Kushner applied for a search warrant to secure the possession of a "One Fabrique National 9mm pistol, serial number 35288 with plastic hand grips that appear wooden and having a matt finish" which was believed located at the plaintiff's residence in Southington.  (Revoir Aff., ¶ 3.)

23.     The above-referenced search warrant was the only search warrant secured in this case.  (Revior Aff., ¶ 3.)

24.     On May 29, 1997, an information and arrest warrant application was presented charging the plaintiff with four counts of wrongdoing.  Count one charged the plaintiff with larceny in the second degree in violation of Conn. Gen. Stat. §53a-123(a)(4); count two charged the plaintiff with receiving a bribe in violation of  Conn. Gen. Stat. § 53a-148; count three charged with the plaintiff with larceny in the second degree in violation of Conn. Gen. Stat. § 53a-123(a)(4); and count four charged the plaintiff with receiving a bribe in violation of Conn. Gen. Stat. § 53a-148.  (Information.)

25.     The information and arrest warrant application was supported by a twelve-page affidavit of Lt. Mannion sworn on May 29, 1997.  (Affidavit.)

26.     Before submitting the application for arrest warrant to a judge of the Superior Court, State's Attorney Michael Dearington for New Haven reviewed Lt. Mannion's affidavit. All information in the possession of the CSP relevant to the investigation was provided to State's Attorney Dearington.  (Dearington Dep., p. 42.)

27.     The affidavit first states that Lt. John J. Mannion is a member of the Department of Public Safety who is currently the Commanding Officer of the Central District Major Crime Squad.  (Affidavit, ¶ 1.)

28.     This statement is accurate.  (Mannion Aff., ¶ 3.)

29.     The affidavit next states that on January 3, 1997, CSP personnel were assigned to investigate allegations that surplus military equipment entrusted to the Northstar program was being traded by the plaintiff to "field officers" of the CSP in exchange for personal items. (Affidavit, ¶ 2.)

30.     The above statement is accurate.  (See, e.g., Covello Aff., ¶¶ 5-7 .)

31.     The affidavit next describes the Northstar program and states that the plaintiff was a "screener" for the State of Connecticut.  It further states that the Northstar program was located in the Altobello complex in Meriden, Connecticut.  It states that pursuant to the terms of the program, material was not to be traded or bartered.  (Affidavit, ¶ 3.)

32.     The statements are accurate.  (See, e.g., 1208 Agreement.)

33.    The affidavit next states that CSP Trooper Richard Binkowski, the Resident Trooper of Woodbury, was a "possible witness" to this wrongdoing.  (Affidavit, ¶ 4.)

34.    The above statement is accurate.  (Covello Aff., ¶¶ 5-7.)

35.    The affidavit detailed the witness statement of Binkowski in which he described an incident that occurred on December 20, 1996 at the Altobello complex.  Binkowski, according to the affidavit, signed a statement which stated that the plaintiff indicated that if he wanted "good or hard-to-get items", he could get them in exchange for Binkowski's old guns.  (Affidavit, ¶ 7.)

36.    This statement accurately describes Trooper Binkowski's statement.  (Binkowski St., p. 2.)

37.    The affidavit next relates that on December 20, the plaintiff provided Binkowski with pants, shirts, a large Gortex cold weather jacket, wool shirts, shoes, mittens, a compass, a jumpsuit and a rifle scope.  The affidavit also relates that Binkowski stated that the plaintiff also made a comment that "only special people get into his secret rooms."  (Affidavit, ¶¶ 8-9.)

38.    This statement accurately describes Trooper Binkowski's Statement, although there is a slight discrepancy concerning the dates.  Trooper Binkowski's statement indicates that this meeting took place on December 13, 1996.  (Binkowski St., pp. 2-4.)

39.    The affidavit next relates that on December 23, 1996, Trooper Binkowski returned to the Altobello complex to give the plaintiff the Belgian 9mm.  This was done, according to the affidavit, in exchange for allowing Binkowski inside the "secret rooms" and in

exchange for the "special items" on the previous meeting, reference above. Accompanying Binkowski was Officer Langin of the Woodbury Police Department. (Affidavit, ¶ 10.)

40. This paragraph in the affidavit accurately summarizes Trooper Binkowski's January 4, 1997, although there is a discrepancy in the dates. Trooper Binkowski's statement indicates that the meeting took place on December 20, 1996. (Binkowski St., p. 3.)

41. The affidavit next relates that Officer Langin was interviewed and "confirmed the gun exchange." Officer Langin also stated that the plaintiff offered to trade binoculars for a .45 caliber pistol. (Affidavit, ¶ 11.)

42. This statement is accurate because in Officer Langin's statement dated January 15, 1997 he stated that the plaintiff offered to trade binoculars for a .45 caliber pistol. (Langin Aff., p. 3.)

43. The affidavit next relates that Officer George Slaiby of the Southbury Police Department was interviewed and stated that he went to the Altobello facility in his capacity as a screener for the Southbury Police Department. He further stated that the plaintiff told him that he would be willing to trade Northstar material for old guns. Officer Slaiby stated that the plaintiff informed him that he had a "secret room, a secret secret room, and a secret secret secret room for the special guns." (Affidavit, ¶ 12.)

44. This assertion accurately reports Officer's Slaiby's statement dated February 13, 1997. (Slaiby St., p. 3.)

45. The affidavit next relates that Trooper Binkowski stopped at CSP Troop L (which is in Litchfield) and that he conversed with Troopers in the building. It also relates that

Binkowski believed that the plaintiff was cheating Woodbury out of material such as jackets. (Affidavit, ¶ 13.)

46.     This paragraph accurately summarizes Trooper Binkowski's statement dated January 4, 1997.  (Binkowski St., p. 4.)

47.     The affidavit next relates that Trooper Binkowski received a telephone call from the plaintiff at his home on January 3, 1997.  The plaintiff gave Trooper Binkowski the serial number on the Belgian 9mm pistol so that Binkowski could contact the weapons unit and have it transferred to the plaintiff.  (Affidavit, ¶ 13.)

48.     This paragraph accurately describes what Trooper Binkowski reported in his January 4, 1997 statement.  (Binkowski St., p. 4.)

49.     The affidavit next relates that a telephone conversation between the plaintiff and Trooper Binkowski on January 7, 1997 was recorded.  In that conversation the plaintiff offered to trade Northstar material for Trooper Binkowski's .45 caliber pistol.  (Affidavit., ¶ 14.)

50.     This telephone conversation took place and was in fact recorded.   (Telephone Conversation.)

51.     The affidavit next relates that on January 9, 1997, Trooper Binkowski met with the plaintiff at the Northstar facility, that the meeting was monitored, and that CSP investigators secured the building after the exchange.  (Affidavit, ¶ 16.)

52.      This paragraph is accurate.  (Covello Aff., ¶ 11.)

53.     The affidavit next lists various excerpts of the January 9, 1997 meeting. (Affidavit, ¶ 17.)

9

54.     These excerpts accurately report what the transcript of the conversation indicates. For example, during the phone conversation, the plaintiff indicated that he got the binoculars from "somebody associated with Northstar."  (Northstar Meeting, p. 13.)

55.     The affidavit next relates that in the January 9, 1997 meeting the plaintiff again inquired of Binkowski about the Winchester rifle.  Trooper Binkowski asked for a generator that he could hook up to his house.  The plaintiff responded "for a Winchester . . . absolutely . . . ." (Affidavit, ¶ 18.)

56.     This paragraph accurately reports what the transcript of that meeting states. (Northstar Meeting, p. 22.)

57.     On January 9, 1997, Trooper Binkowski provided the plaintiff with a .45 caliber pistol which he owned personally, and which was the subject of the January 7, 1997 telephone conversation.  (Northstar Meeting, p. 5.)

58.     The affidavit next relates that at the January 9, 1997 meeting, Trooper Binkowski received from the plaintiff a pair of binoculars marked "Military Marine," three compasses and ten face shields. It further states that the Northstar paperwork receipt drawn up by the plaintiff records only "3 compasses and 10 face shields."  (Affidavit, ¶ 19.)

59.     This statement is accurate.  (Northstar Meeting, p. 16.)

60.     There was probable cause to believe that the binoculars were Northstar property because the plaintiff stated that he received them from "somebody associated with Northstar."

This is supported by the transcript of the Meeting:

D'Angelo:     That's just the Stiner [sic; Steiner] Military Marine Model.

Binkowski:     So you had these, these are your own, you didn't get these from um, McGuire [Air Force base]?

D'Angelo:     I did but, not I got them from somebody associated with Northstar.  I got two of those.  Fucking Pagoni.

Binkowski:     One of your connections.

D'Angelo:     Yeah, there's a fucking Pagoni has like I think two pair of those.

Binkowski:     Oh, these are the ones you told me the Lt., you had a shit load of them and the Lt.'s came in-

D'Angelo:     25

Binkowski:     and took them.

D'Angelo:     Not even as good as that though, I have the best ones.  (Northstar meeting, p. 13.)

61.     The affidavit next relates that on January 13 and 14, 1997, CSP investigators from Central District Major Crime Squad Conducted a search for weapons and ammunition at the Northstar facility.  (Affidavit, ¶ 20.)

62.     This statement is accurate.  (Inventory.)

63.     The affidavit next states that on January 14, 1997 that investigators interviewed William Trainham who worked at the Northstar facility. It further states that Trainham indicated that the plaintiff had a barter system and, in exchange for "knives and guns", he would trade "good stuff."  (Affidavit, ¶ 21.)

64.     The affidavit next details Trainham's recollection of the meeting at the Northstar complex on January 9, 1997.  (Affidavit, ¶¶ 21-24.)

65.     Trainham's statement is accurately summarized in these paragraphs of the affidavit.  (Trainham St., pp. 3-5.)

66.     The affidavit next states that Trooper Binkowski described the 9mm pistol that he gave to the plaintiff as Fabrique National 9mm, serial number 35288. (Affidavit, ¶ 25.)

67.     The statement is accurate.  (Binkowski St., pp. 2-3.)

68.     The affidavit next states that on January 29, 1997 CSP investigators executed a search and seizure warrant at the plaintiff's home and seized a "Fabrique National" 9mm pistol, serial number 35288.  (Affidavit, ¶ 26.)

69.     This statement is accurate.  (Revoir Aff.)

70.     The affidavit next states that as part of the investigation, CSP investigators secured from the Department of Defense a printout which lists all items the agency was entitled to provide.  Among the items was a commercial grade meat grinder bearing stock number 7320-00-879-9881 with a cost listed as $1,787.57.  It further states that, while at the facility, the plaintiff asked Trainham to load the grinder on a dolly and the next day it was gone.  Trainham stated that he believed that it went to the plaintiff's next door neighbor, Pasquale DiChello.  The affidavit further states that investigators interviewed DiChello and he stated that the plaintiff gave him a stainless steel meat grinder.  Upon examination, the meat grinder was observed to have stock number 7320-00-879-9881.  (Affidavit, ¶ 27.)

71.     These statements are accurate.  (DiChello St.; State Police Inventory.)

72. DiChello is a civilian and the meat grinder was not used for police related matters. (D'Angelo Dep., pp. 205-207.)

73. The affidavit further indicates that based on the facts and circumstances described above, that probable cause existed to believe that the plaintiff committed the offense of bribe receiving and defrauding the public community. (Affidavit, ¶ 28.)

74. On May 29, 1997, Judge Licari of the Connecticut Superior Court signed the information, finding that based on the affidavit, probable cause existed that an offense had been committed. (Information.)

75. On May 29, 1997, the CSP arrested the plaintiff. He was released on a promise to appear. (Arrest Warrant.)

76. On May 5, 1997, a CSP Internal Affairs complaint was filed against the plaintiff. The complaint summary stated: "During TFC D'Angelo's tenure as 'administrator' for the Northstar Program, he received personal gain from the selective distribution of the State of Connecticut Surplus Military Equipment." (Internal Affairs Complaint.)

77. On May 9, 1997, the Internal Affairs Unit of the CSP notified the plaintiff that an Internal Affairs investigation had commenced concerning his administration of the Northstar program. (Internal Affairs Complaint.)

78. A CSP Internal Affairs investigation is a quasi-judicial hearing. <u>Arigno v. Murzin</u>, 1998 Conn. Super. LEXIS 691 and <u>Bieluch v. Smith</u>, 1993 Conn. Super. LEXIS 1319.

79. On March 12, 1998, the plaintiff and the CSP signed a Stipulated Agreement in which he agreed that the Internal Affairs charges against him would be sustained. The plaintiff

further agreed that: (1) he would receive a forty-five day suspension; (2) he would not grieve the issues raised in connection with the Agreement; (3) he would retire on May 1, 1998; and (4) he "waives his right to file any and all civil or administrative claims related to this matter." (Stipulation.)

80.     This agreement was signed by, among others, the plaintiff, Attorney John Williams (his criminal defense attorney), Department of Public Safety Commissioner John Connelly, and CSP commanding officer John Bardelli.  (Stipulation.)

81.     On, July 15, 1999, State's Attorney Dearington moved in the Superior Court to nolle the charges against the plaintiff.   (Hearing, p. 1.)

82.     The court dismissed the charges.  (Hearing, p. 1.)

83.     State's Attorney Dearington sought a nolle of the charges because, given that the plaintiff had resigned from the CSP, he felt there was not a pressing need to prosecute the plaintiff.  (Dearington Dep., pp. 39-40.)

84.     The defendants did not omit any material information from the search warrant application.  (Kasche Aff., ¶ 11; Russell Aff., ¶ 18; Mannion Aff., ¶ 6; Covello Aff., ¶ 17; McGuire Aff., ¶ 5; Kirschner Aff., ¶ 12.)

85.     The defendants did not defame the plaintiff.  (Kasche Aff., ¶ 14; Russell Aff., ¶ 18; Mannion Aff., ¶ 5; Covello Aff., ¶ 16; McGuire Aff., ¶ 8; Kirschner Aff., ¶ 11.)

86.     The defendants did not omit any material information from the arrest warrant application.  (Kasche Aff., ¶ 14; Russell Aff., ¶ 18; Mannion Aff., ¶ 7; Covello Aff., ¶ 17; McGuire Aff., ¶ 5; Kirschner Aff., ¶ 12.)

87. The defendants did not maliciously prosecute the plaintiff. (Kasche Aff., ¶ 14; Russell Aff., ¶ 17; Mannion Aff., ¶ 5; Covello Aff., ¶ 16; McGuire Aff., ¶ 4; Kirschner Aff., ¶ 11.)

88. Defendants Kasche, Russell, Covello, McGuire and Kirschner did not have any personal involvement in the search warrant affidavit. (Kasche Aff., ¶ 12; Russell Aff., ¶ 14; Covello Aff., ¶ 13; McGuire Aff., ¶ 6; Kirschner Aff., ¶ 9.)

DEFENDANTS,
Kenneth Kirschner, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:____/s/_____
Neil Parille
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar No. ct15278
Telephone No.: (860) 808-5450
Fax No.: (860) 808-5591
Email:  neil.parille@po.state.ct.us

## CERTIFICATION

I hereby certify that a copy of the foregoing was sent by first-class mail, postage prepaid to the following on this 31st day of August, 2005:

Jon Golas, Esq.
Golas, Golas & Golas, PC
945 Main Street, Suite 306
Manchester, CT  06040

____/s/_____
Neil Parille
Assistant Attorney General