UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EUGENE D'ANGELO,<br>*Plaintiff* | ) <br> ) <br> ) | NO.3:02CV1313(SRU) |
| v. | ) <br> ) <br> ) | |
| KENNETH KIRSCHNER, ET AL.<br>*Defendants* | ) <br> ) | August 25, 2005 |

### AFFIDAVIT

I, Susan Revoir, having been duly sworn, hereby depose and say:

1. That I am over the age of eighteen years and understand the nature and obligations of an oath.

2. That I am the Supervisor of the Reports & Records Unit of the State of Connecticut Department of Public Safety.

3. That only search warrant in connection with case report I97-008334 is dated January 23, 1997, a copy of which is attached hereto and made a part hereof.

_____
Susan Revoir

STATE OF CONNECTICUT  )
                      )  ss, Middletown
COUNTY OF MIDDLESEX   )

Subscribed and sworn to before me this 25th day of August, 2005.

_____
Notary Public
My Commission Expires:

SANDRA M. LUCIER
NOTARY PUBLIC
MY COMMISSION EXPIRES 4-30-2007

Form JD-CR-52 must also be completed

| INSTRUCTIONS TO THE APPLICANT | INSTRUCTIONS TO G.A. CLERK |
|---|---|
| File a copy of the application for the warrant and all affidavits upon which the warrant is based, in a sealed envelope, with the clerk of the court for the geographical area within which the search will be conducted no later than the next business day following the issuance of the warrant. Indicate the police department, case number and date of issuance on the front of the sealed envelope. | 1. Prior to the execution and return of the warrant, do not disclose any information pertaining to the application for the warrant or any affidavits upon which the warrant is based.<br>2. Upon execution and return of the warrant, affidavits which are the subject of an order dispensing with the requirement of giving a copy to the owner, or person within forty-eight hours shall remain in the custody of the clerk's office in a secure location apart from the remainder of the court file. |

**TO: A Judge of the Superior Court**

The undersigned, being duly sworn, complains on oath that the undersigned has probable cause to believe that certain property, to wit:

One Fabrique National 9mm pistol, serial number 35288 with plastic hand grips that appear wooden and having a matt finish.

☐ is possessed, controlled, designed or intended for use or which is or has been or may be used as the means of committing the criminal offense of:

  ☐ was stolen or embezzled from:

☒ constitutes evidence of the following offense or that a particular person participated in the commission of the offense of:
  Larceny in the second degree, Sec. 53a-123.

☐ is in the possession, custody or control of a journalist or news organization, to wit:

  ☐ and such person or organization has committed or is committing the following offense which is related to such property:

  ☐ and such property constitutes contraband or an instrumentality of the criminal offense of:

And is within or upon a certain person, place, or thing, to wit:
The property located at 50 Lucy Court, Southington, Connecticut, which includes a single family split level house, white in color with a brown roof, brown trim and brick facing. The house has a attached two car garage with brown garage doors. The number "50" is on the mail box and a front post. Also included is a white shed type building with a brown roof which is located in the back yard.

(Revoir Aff)

And that the facts establishing the grounds for issuing a Search and Seizure Warrant are the following:

1. That the affiant, Detective Edward M. Kushner is a regular member of the Department of Public Safety, Division of State Police and has been a member since 1978 and at the present time is assigned to the Central District Major Crime Squad.

2. That the affiant, Sgt. Brian McLean is a regular member of the Department of Public Safety, Division of State Police and has been a member since 1984 and at the present time is assigned to the Central District Major Crime Squad.

3. That the affiants have personnel knowledge of the facts and circumstances hereinafter related as a result of their own investigative efforts as well as those of other officers who have related their findings to them.

4. That on January 3, 1997, Connecticut State Police personnel were assigned to begin an initial inquiry into allegations that surplus military equipment entrusted to the Connecticut State Police through a program known as "Northstar" was being improperly distributed and/or misappropriated by a member of the Connecticut State Police. The focus of the inquiry was Trooper Eugene D'Angelo, who is assigned to the Statewide Narcotics Task force and is responsible for the program.

5. The "Northstar" program, which is administered by the Department of Defense, provides military equipment to Law Enforcement agencies for use to combat illegal drug activities. A Law Enforcement agency can apply to obtain military items from this program. Once approved, the agency can request and receive a variety of military items, ranging from clothing and binoculars to helicopter parts. D'Angelo was the "Screener" for the Connecticut State Police and requested and received various military items. The "Northstar" facility for the Connecticut State Police is located at the Altobello complex on Undercliff Road in Meriden, Connecticut. Under the "Terms and Conditions:" section of the Agreement between the State of Connecticut and Section 1208 Participants (AKA: "Northstar"), the agreement states that "Property may not be obtained for the purpose of sale, lease, rent, exchange, barter, to secure a loan or to otherwise supplement normal State/Drug law Enforcement Activity budgets."

6. The allegations suggested that certain State Police field personnel were engaged in activity whereby they were trading personal property, specifically firearms, to D'Angelo in exchange for more favorable distribution of the surplus military equipment provided by the Northstar program. Trooper Richard Binkowski, the Resident Trooper of the Town of Woodbury, was a possible witness to this type of activity.

7. In a written statement, Binkowski told State Police investigators that on December 13, 1996, he met with Gene D'Angelo to obtain 60 cold weather Gortex jackets which were "Northstar" items designated for Woodbury Police Officers. Apparently D'Angelo picked up the jackets while obtaining additional items for the Connecticut State Police. Binkowski introduced himself to the first person he met at the State Police "Northstar" facility and the person in turn introduced himself as Gene D'Angelo.

(See PAGE 3 below for continuing Affidavit; Signatures of Affiant(s); and Jurat)

(Revoir Aff)

8. D'Angelo directed Binkowski to a duffel bag and said that was his stuff. Binkowski was under the impression that he was picking up 60 jackets and indicated to D'Angelo that there was no way all that could be in one duffel bag, but D'Angelo indicated that the military cut his items because he only had 12 guys to outfit.

9. While Binkowski was in D'Angelo's office, he noticed a box of comic books and inquired as to who collected comics. D'Angelo stated that a worker brought the books in and that anyone who wanted them could take them. Binkowski told D'Angelo that he collected comics and asked if he could take a couple for his collection. D'Angelo asked Binkowski what else he collected. Binkowski told D'Angelo that he collected comics, Baseball cards and that he had several guns that were given to him when his grandfather died. At this time, D'Angelo stated that he collected guns and especially World War II items. D'Angelo asked Binkowski if he had any guns that he wanted to get rid of. Binkowski told D'Angelo that several of his grandfather's guns were old and probably did not work. D'Angelo stated he would be willing to negotiate for old guns. Binkowski took this to mean that if he wanted good or hard to get items, D'Angelo could get him these items if he traded the old guns with him.

10. The conversation between Binkowski and D'Angelo became centered on a old Winchester rifle Binkowski purchased several years ago. D'Angelo asked Binkowski if he would be interested in getting rid of this rifle. After talking about old guns, Binkowski told D'Angelo that he had an old Belgium 9mm that he believed was his grandfather's that he could have as Binkowski did not believe it worked and that it was in poor shape. After stating this, D'Angelo said something to the effect of "let me show you what else I have." D'Angelo locked the front door to the "Northstar" garage and told the other worker in the building to get him a bag of camo clothing. D'Angelo told the worker to find some good pants and shirts and threw several of them into a duffel bag for Binkowski to take back to Woodbury. D'Angelo then took Binkowski into a room inside the garage. D'Angelo unlocked the room and said that it was his secret room. D'Angelo opened a box and handed Binkowski a large Gortex cold weather jacket. D'Angelo placed this jacket into a duffel bag and said that the bag was Binkowski's. D'Angelo opened another box and took two dark green wool shirts out and placed them into the duffel bag also. Binkowski also received a pair of shoes, mittens, a compass, a jumpsuit and a rifle scope. Binkowski asked for a foot locker but had no room to take one this day. D'Angelo made a comment about how only special people get into his secret rooms. When Binkowski was leaving he told D'Angelo that he would bring a army .45 caliber pistol to show him the next time he came.

11. When Binkowski returned to his office and unpacked the duffel bags, he found papers that D'Angelo had signed which were receipts for 12 cold weather Gortex jackets and a first aid kit for Woodbury Police. Inside the bag Binkowski found only 9 jackets and 6 gas masks. The other duffel bag contained assorted camo pants and shirts. While Binkowski was unpacking the bags a

Wherefore the undersigned requests that a warrant may issue commanding a proper officer to search said person or to enter into or upon said place or thing, search the same, and take into custody all such property.

| CITY/TOWN | DATE | SIGNATURE AND TITLE OF AFFIANT |
|---|---|---|
| New Haven | Jan 23, 1997 | Det. Edward Kushman |
| New Haven | 01-23-97 | Sgt. B. C. McZ |
| JURAT  Subscribed and sworn to before me on: | DATE 1-23-97 | [signature] |

(Revoir Aff)

Woodbury Police Officer was present and made a comment about how Woodbury got screwed out to 50 jackets and that he felt that D'Angelo had taken these jackets. Binkowski told the Officer that D'Angelo had told him that the military down sized their items because of the size of the department.

12. On December 23, 1996, Binkowski returned to the garage to pick up the footlocker and to give D'Angelo the Belgium 9mm. Binkowski stated that D'Angelo had taken the gun in exchange for allowing Binkowski to get into the "secret" rooms and for giving Binkowski the "special" items. On this date, Officer Langin of the Woodbury PD was with Binkowski. Binkowski also had his military .45 caliber pistol with him. D'Angelo brought Binkowski and Langin into his office and locked the door. Binkowski gave D'Angelo the 9mm and told him he could have it if he wanted it as Binkowski did not believe it worked. He then showed D'Angelo the .45 caliber pistol. D'Angelo stated that he wanted this pistol as well. Binkowski told D'Angelo that he did not want to get rid of this pistol. D'Angelo told Binkowski to follow him and took him outside to his truck. D'Angelo took a locked container from his truck and removed a pair of binoculars from the container. D'Angelo said that if Binkowski gave him the .45 cal. He would Give Binkowski the binoculars. These binoculars appeared to be military binoculars as they were big and had what Binkowski thought were range finder numbers inside the lens. Binkowski told D'Angelo that he had a pair of binoculars and that he did not want to get rid of the .45 caliber pistol. D'Angelo said that he really liked the .45 and wanted to negotiate for it. They then went back inside the garage and Binkowski told D'Angelo that he wanted to get the footlocker that he told Binkowski he could have the week prior. D'Angelo then took Binkowski and Langin into his secret room. D'Angelo gave a foot locker to Binkowski and one to Langin. D'Angelo made a comment about how he knows that being a resident trooper and constable, weapons are brought into the resident trooper's office to be destroyed and how he would be interested in any guns brought into their office. As Binkowski and Langin were leaving, D'Angelo made a comment to Langin that he got a lot of stuff today but that he (D'Angelo) did not get anything from Langin. D'Angelo then threw 6 shovels into their footlockers without Binkowski or Langin asking for them.

13. On his way home, Binkowski got into a conversation with several Troopers at Troop L and mentioned how he had gotten several items from project "Northstar" and that he felt that he had gotten screwed out of several winter jackets and that Binkowski thought that D'Angelo had taken them. Binkowski mentioned that D'Angelo had large sized clothing that he appeared to be hiding and only giving it to special people. One of the Troopers was very upset and discussed that if the military knew what D'Angelo was doing they would get the FBI involved to investigate D'Angelo. The overall supervisor of the "Northstar" project was then notified of the above mentioned suspicions.

Wherefore the undersigned requests that a warrant may issue commanding a proper officer to search said person or to enter into or upon said place or thing, search the same, and take into custody all such property.

| CITY/TOWN | DATE | SIGNATURE AND TITLE OF AFFIANT |
|---|---|---|
| New Haven | Jan 23, 1997 | Det. Edward Kushner |
| New Haven | 01-23-97 | Sgt. B-C Mc__ |
| JURAT  Subscribed and sworn to before me on: | DATE 1-23-97 | _____ |

(Revoir Aff)

14. On the night of January 3, 1997, Binkowski received a telephone call from D'Angelo at his home. D'Angelo called to give Binkowski the serial number off the 9mm pistol he (Binkowski) had given D'Angelo so that Binkowski could contact weapons to transfer the gun to D'Angelo.

15. As a result of the information provided in Binkowski's statement, State Police investigators provided Binkowski with a recording device in order to record possible incriminating statements made by D'Angelo in an anticipated telephone conversation to take place the evening of January 7, 1997. Binkowski contacted investigators and advised that he had spoken to D'Angelo and recorded the conversation in which Binkowski agreed to exchange a pistol that belonged to him for certain "Northstar" items in the control of D'Angelo.

16. On January 9, 1997, Binkowski met with D'Angelo at the Connecticut State Police "Northstar" garage in Meriden, Connecticut. In anticipation of an exchange of Binkowski's pistol for military equipment from the "Northstar" program, the conversation at the meeting was monitored. That transaction and relevant conversation were recorded. At approximately 1735 hours, the exchange was completed, and State Police investigators responded to the garage, met with D'Angelo and the "Northstar" building was secured.

17. Among other recorded conversation the following are excerpts from the transcribed recording: D"Angelo: "What's your wife say?" Binkowski: "Well, she wants the gun out of the house, so I got it here in my pocket." D'Angelo: "I went through it, believe me. Where's the holster?" Binkowski: "Oh, you want the holster, too?" D'Angelo: "Yeah!" Binkowski: "I can't give the, I mean the holsters not going to kill my kid, this is gonna." D'Angelo: "Oh, come on, you didn't bring it." Binkowski: "You want the holster too." D'Angelo: "Yeah." Binkowski: "Oh Jesus, your really pushing it now. Well, than we're going to have to talk trade on the holster." D'Angelo: "Absolutely." Binkowski: "I mean that right there, Gene, the binoculars for a 45, come on." D'Angelo: This is well, price wise, you know how much this is?" Binkowski: "I think a couple of hundred dollars." D'Angelo: "Yeah, but the binoculars are a thousand." Binkowski: "Where did you get those?" D'Angelo: "Those are the best, the tops, yeah, this is nice, this is, this is a nice piece, 45's are-" Binkowski: "Are those your binoculars? You're giving me your own binoculars?" D'Angelo: "Yeah, my own, that's a thousand dollars." Conversation about the binoculars continued. Binkowski: "You can't, you can't buy them that say uh military marines on them though I'm sorry." D'Angelo: "Yeah." Binkowski: "Stiner made in Germany, huh?" D'Angelo: That's just the Stiner Military marine model." Binkowski: "So you had these, these are your own, you didn't get these from uhm, McGuire?" D'Angelo: "I did but, not I got them from somebody associated with Northstar...."

18. On January 9, 1997, Binkowski received a pair of binoculars, marked "Military Marine," 3 compasses, one sleeping bag and 10 face shields. The "Northstar" paperwork receipt generated from the January 9, 1997 transaction between Binkowski and D'Angelo only records "3 compass and 10 face shields."

Wherefore the undersigned requests that a warrant may issue commanding a proper officer to search said person or to enter into or upon said place or thing, search the same, and take into custody all such property.

| CITY/TOWN | DATE | SIGNATURE AND TITLE OF AFFIANT |
|---|---|---|
| New Haven | Jan. 23, 1997 | Det. Edward Kushner |
| NEW HAVEN | 01-23-97 | Sgt. B—— C. M—— |
| JURAT — Subscribed and sworn to before me on: | 1-23-97 | [signature] |

(Revoir Aff)