# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EUGENE D'ANGELO | : | NO. 3:02CV1313(SRU) |
| *Plaintiff,* | : | |
| | : | |
| VS. | : | |
| | : | |
| KENNETH KIRSCHNER, ET AL. | : | |
| *Defendants.* | : | NOVEMBER 9, 2005 |

### AFFIDAVIT OF LYNN WITTENBRINK

STATE OF CONNECTICUT     )
                                   ) s.s. Hartford, Connecticut

COUNTY OF HARTFORD      )

      I, Lynn Wittenbrink, being of sound mind and legal age, and having been duly sworn, do hereby depose and say that:

      1.    I am over the age of eighteen and understand the obligations of an oath.

      2.    I am employed by the Office of the Attorney General, holding the position of Assistant Attorney General.

      3.    I have attached to this affidavit the true and accurate portions of the plaintiff's deposition which are referenced in the defendants' motion for summary judgment.

                                                                      *Lynn Wittenbrink*

Subscribed and sworn to before me this ___9th___ day of November, 2005.

Neil Parille
Commissioner of the
Superior Court

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 1

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
2

3     - - - - - - - - - - - - - - - x
                                    |
4     EUGENE D'ANGELO,
              Plaintiff,            |    Case Number
5                                        3:02CV01313(SRU)
      VS.                           |
6
      KENNETH KIRSCHNER, ET AL.,    |
7             Defendants.
                                    |
8     - - - - - - - - - - - - - - - x

9

10                          COPY

11

12            DEPOSITION OF:  Eugene D'Angelo
              DATE:   June 2, 2004
13            HELD AT:  Office of the Attorney General
                        110 Sherman Street
14                      Hartford, Connecticut

15

16

17

18

19

20

21

22

23        Reporter:  Robin L. Balletto, RPR, LSR # 230
              BRANDON SMITH REPORTING SERVICE
                       (860) 549-1850
24                   44 Capitol Avenue
              Hartford, Connecticut  06106
25

Brandon Smith Reporting

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 2
```
 1
      APPEARANCES:
 2

 3          Representing the Plaintiff

 4              GOLAS, GOLAS & GOLAS, P.C.
                Jon D. Golas, Esq.
 5              945 Main Street
                Suite 306
 6              Manchester, Connecticut  06040

 7

 8         Representing the Defendants

 9              OFFICE OF THE ATTORNEY GENERAL
                Lynn D. Wittenbrink, Esq.
10              110 Sherman Street
                Hartford, Connecticut  06105
11
                Also Present:  Monica Doouteiro,
12              Elliott Tiomkin and Shannon Henne,
                Student Interns
13
                John Mannion, Kenneth Kirschner and
14              Andrew Russell, Defendants

15

16

17

18

19

20

21

22

23

24

25
```

Brandon Smith Reporting

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                          Eugene D'Angelo

Page 3

```
 1                        I   N   D   E   X
 2    WITNESS                                             PAGE

 3    Eugene D'Angelo,
              Direct Examination by Ms. Wittenbrink         5
 4

 5                    E   X   H   I   B   I   T   S
                                                         PAGE
 6
      1      Re-Notice of Deposition                        5
 7
      2      Arrest Warrant Application                      5
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                          Eugene D'Angelo

Page 4

```
1                          STIPULATIONS

2

3        IT IS STIPULATED by the attorneys for the Plaintiff

4    and the Defendants that each party reserves the right to

5    make specific objections in open court to each and every

6    question asked and the answers given thereto by the

7    witness, reserving the right to move to strike out where

8    applicable, except as to such objections as are directed

9    to the form of the question.

10

11       IT IS STIPULATED and agreed between counsel for

12   the parties that the proof of the authority of the

13   Notary Public before whom this deposition is taken is

14   waived.

15

16       IT IS FURTHER STIPULATED and agreed that the

17   reading and signing of this deposition are not waived

18   and any defects in the Notice are waived.

19

20

21

22

23

24

25
```

Brandon Smith Reporting

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                      Eugene D'Angelo

Page 5

```
 1              (Deposition commenced at 10:10 a.m.)

 2

 3                      Eugene D' Angelo,

 4          having been first duly sworn, was examined

 5          and testified as follows:

 6

 7                 (Defendants' Exhibits 1 and 2:

 8                  Marked for identification.)

 9

10              MR. GOLAS:  For the record, he's going to

11    read and sign.

12

13              DIRECT EXAMINATION BY MS. WITTENBRINK

14

15      Q    Sir, I'm an assistant attorney general.  My

16    name is Lynn Wittenbrink, and I'll be doing your

17    deposition today in this matter.  For the record, could

18    you state your full name and your address, please?

19      A    It is Eugene D'Angelo, D apostrophe

20    A-N-G-E-L-O, 50 Lucy Court, Southington, Connecticut.

21      Q    Your Social Security number?

22      A    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.

23      Q    Have you ever been known by any other names?

24      A    No.

25      Q    Any other Social Security numbers?
```

Brandon Smith Reporting

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                            Eugene D'Angelo

Page 30

```
 1   party when he claimed I was -- he made some kind of

 2   statement at the retirement party that the similarity

 3   between myself and some other person is where thieves

 4   and got away with it, that might be part of that false

 5   statement.

 6        Q    He made a statement at his retirement party?

 7        A    At his retirement party.

 8        Q    About you?

 9        A    About me.

10        Q    And another individual?

11        A    Right.

12        Q    Who was the other individual?

13        A    I can't remember.  It was F. Buckley, I can't

14   remember who it was.

15        Q    Was it another law enforcement person?

16        A    No, it was an attorney.

17        Q    Was it Mac Buckley?

18        A    Mac Buckley.

19        Q    And what was the statement that he made?

20        A    Oh, it was something to the effect what is

21   similar between Gene D'Angelo and F. Mac Buckley, Mac

22   Buckley, whatever, that they both stole from the state

23   and got away with it.

24        Q    And when was this party?

25        A    I don't know the dates.  I don't know.
```

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 31

1    Q    Can you give me a ballpark?

2    A    At his retirement, when he retired.  I don't

3    know the date.

4    Q    Was that in the last two years?

5    A    Must have been in the last three years.

6    Q    Aside from that and aside from the arrest

7    which you claim is a false statement, are you aware of

8    any other false statements that you're alleging that

9    John Mannion made about you?

10   A    I am not.

11   Q    What about Richard Covello.  Aside from the

12   arrest, which I understand you're claiming to be a false

13   statement, are you aware of any other false statements

14   Richard Covello made about you?

15   A    I'm sure he made false statements in the

16   internal affairs investigation being did he blatantly

17   lie, absolutely, about our meeting together.  Covello

18   and I met together before this arrest some time about

19   September, yes, he did make false statements in the

20   internal affairs report about the nature of that meeting

21   and what he said.

22   Q    We'll get to the internal affairs

23   investigation in a bit.  Other than whatever statements

24   Mr. Covello made in the internal affairs investigation

25   and the prosecution of your arrest, are you claiming

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 32

1    that Richard Covello made any other false statements

2    about you?

3         A    Not that I'm aware of right now.

4         Q    What about Edward Kashe?

5         A    No.

6         Q    What about William McGuire?

7         A    In the internal affairs, back to the internal

8    affairs, yes.

9         Q    What about anything besides whatever

10   statements Mr. McGuire might have made to internal

11   affairs?

12        A    Not that I know of, no.

13        Q    What about Andrew Russell?

14        A    No.

15        Q    Sir, you're seeking your attorneys fees in

16   this case?

17        A    Yes.

18        Q    You're seeking the attorneys fees that you

19   paid in defense of the criminal matter?

20        A    No, you see, I don't know what I'm seeking,

21   that is why I have an attorney.  My attorney is seeking

22   these fees, how we're doing that he's doing that, that

23   is his function.

24        Q    How much did you pay your attorney in the

25   criminal matter?

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                          Eugene D'Angelo

Page 33

```
 1      A     Which criminal matter?

 2      Q     The one that is the subject of this lawsuit?

 3      A     This one here?

 4      Q     Yes.

 5      A     I paid him $2,500.

 6      Q     That is all that you paid him?

 7      A     That's all.

 8      Q     What other criminal matters have you had

 9   against yourself?

10      A     Are you saying what am I paying my attorney

11   right now?

12      Q     No, this is a civil matter.

13      A     Oh, in the criminal case what did I pay.  No,

14   I paid 5,000 I paid to John Williams, I paid Karen Torre

15   3,000, I paid other fees for a private investigator to

16   my attorney John Williams, I don't recall right now, I

17   paid for Robert Skelton.  I can't remember what I paid

18   Robert Skelton, but it was something to do with -- oh, I

19   paid an attorney in Hartford originally, and I can't --

20   I don't recall his name, and maybe John MacDonald, I'm

21   not sure, I would have to look.

22      Q     Have you ever been arrested other than the

23   incident which is the subject of this lawsuit?

24      A     Yes.

25      Q     What for?
```

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

Page 34

1      A    Trespassing.

2      Q    When was that?

3      A    When I was 16 around 1973.

4      Q    Any other arrest other than the trespass and

5  the one that is the subject of this lawsuit?

6      A    No.

7      Q    Let's talk about these attorneys a little bit.

8  What did John Williams represent you on?

9      A    Criminal.

10     Q    The criminal matter.

11     A    Criminal case.

12     Q    He was your criminal defense.  Did he also

13  represent you in the internal affairs matter, the labor

14  matter?

15     A    He was there during the internal affairs, but

16  I don't know how much representation they can give you,

17  I don't think they can actually represent you.

18     Q    What about Karen Torre, what did you pay her

19  for?

20     A    Criminal, for the criminal matter.

21     Q    So she represented you in the criminal matter

22  in addition to John Williams?

23     A    Yes.

24     Q    What about John MacDonald, what did he

25  represent you for?

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 35

1      A      It was also the criminal, but I would have to

2   clarify that.  I don't know if he did, or if it was more

3   the civil end, I'm not sure.

4      Q      What about the attorney in Hartford whose name

5   you don't recall?

6      A      That was, I went to him for a -- I paid him,

7   he never represented, it was more for an initial

8   counseling.

9      Q      Consultation?

10     A      Yes, consultation.

11     Q      You paid 2,500 to Mr. Golas?

12            MR. GOLAS:  Objection.  I'm going to

13   object.  Our fee is not the basis of this proceeding?

14            MS. WITTENBRINK:  Are you seeking

15   attorney fees in this proceeding?

16            MR. GOLAS:  Yes, as part of the Civil

17   Rights 1983 component, those would be the time capped.

18   If we prevail in the claim, obviously we're entitled to

19   attorneys fees.  What our fee arrangement is is not part

20   of this, we're not claiming that.

21            MS. WITTENBRINK:  Well, the case law,

22   sir, is it is not confidential, especially if you're

23   claiming it as part of the damages in the lawsuit, which

24   you are.

25            MR. GOLAS:  My fee arrangement is not

Brandon Smith Reporting

D'Angelo vs Kirschner, et al

6/2/2004                                                                    Eugene D'Angelo

Page 36

```
 1    only the 1983 hours kept fees that is our only component

 2    if we prevail in the claim, that is our only attorneys

 3    fees claim it wouldn't be our fee arrangement.

 4                   MS. WITTENBRINK:  Well, I disagree.

 5    BY MS. WITTENBRINK:

 6         Q    Would you answer the question, sir?

 7         A    What is the question again?

 8         Q    Have you paid Attorney Golas, is that the

 9    $2,500 you mentioned?

10         A    Yes.

11         Q    And you paid Robert Skelton additional money?

12         A    Yes, I did.

13         Q    And that was to pursue this lawsuit?

14         A    That was for this lawsuit and, yes, that was

15    only related to -- he had no criminal part at the time,

16    I don't believe.

17         Q    And how much did you pay Mr. Skelton?

18         A    At least -- that was a couple thousand

19    dollars, I don't know.  I would have to look at the

20    list.

21         Q    Did you ever pay an attorney not in money but

22    in some other way?

23         A    No.

24         Q    Who was the private investigator, sir?

25         A    O'Donnell.
```

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 37

```
 1        Q     And you don't know how much you paid him?

 2        A     No.

 3        Q     Any idea?

 4        A     I don't know.

 5        Q     And was that for this matter or for defending

 6   the criminal?

 7        A     That was for criminal.

 8        Q     And that was through John Williams' office?

 9        A     John Williams' office.

10        Q     Who is your general practitioner doctor?

11        A     Dr. Prezioso.

12        Q     Is he the one that referred you for the sleep

13   study?

14        A     Yes, he did.

15        Q     And where is he located?

16        A     Southington.

17        Q     Do you know his first name?

18        A     I don't.

19        Q     Did you ever see any other health care

20   practitioner with regard to this matter?

21        A     No, not that I remember, I didn't.

22        Q     Sir, you claim loss of earnings in this

23   matter?

24        A     Yes.

25        Q     What earnings are you claiming?
```

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                      Eugene D'Angelo

Page 86

1      Q    On what occasion did you go to his house?

2      A    I think it was because he became lieutenant

3    colonel, I'm not sure.

4      Q    There was a party?

5      A    Yes, it was some kind of party.

6      Q    Are you still friendly with him?

7      A    No.

8      Q    Why not?

9      A    I don't see him, I don't see him at all.  I

10   haven't spoken to him in years.

11     Q    Did you have a falling out, or you just got

12   out of touch after you left?

13     A    We got out of touch.

14     Q    You need to let me finish the question.

15     A    I thought you did, sorry.

16     Q    After you left Kirschner's office?

17     A    Yes, we didn't have a lot of contact.  After I

18   left Kirschner's office we had a lot of contact.  After

19   this arrest we had very little contact.

20     Q    What was the nature of your contact after you

21   left Kirschner's office?

22     A    It was about Northstar, and about statewide

23   narcotics, and the marijuana eradication.  He was in

24   operations, lieutenant colonel, and we were friendly.

25     Q    Did you ever discuss the meat grinder with

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

Page 87

1   him?

2        A    I don't recall, no.

3        Q    Did you discuss it with any of your other

4   supervisors other than the Commissioner?

5        A    The other supervisors would have seen it

6   there.

7        Q    The question was did you ever discuss it with

8   them, sir?

9        A    Discuss it that I'm going to give it to

10  someone, or discuss it that I'm going to throw it away.

11       Q    Discuss it in any fashion?

12       A    Yes.

13       Q    Who did you discuss it with?

14       A    I discussed it with, I think it was John Duly,

15  Sergeant Duly, because it was comical that I thought it

16  was a grinder for metal, and it is a meat grinder, and

17  it was in the building quite a bit, and a lot of people

18  who came in would see this meat grinder being rolled

19  around.

20       Q    Other than Sergeant Duly, did you discuss the

21  meat grinder with anyone else?

22       A    I don't recall, no.

23            MS. WITTENBRINK:  It is about noon, and

24  we haven't really gotten into the arrest warrant

25  application.  Do you want to take a break?

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 88

1              MR. GOLAS:  Do you want to go for another

2    hour and then take a lunch break?

3              MS. WITTENBRINK:  Why don't we take a

4    five-minute break.

5              (Recess:  12:05 p.m. to 12:18 p.m.)

6    BY MS. WITTENBRINK:

7       Q    Back on the record.  Sir, you're still under

8    oath.

9       A    Yes.

10      Q    I'm going to refer your attention again to

11   what has been marked as Exhibit 2, paragraph 3, The

12   Northstar program, the first sentence I'm going to read

13   out loud.  "The Northstar program which is administered

14   by the Department of Defense provides military equipment

15   to law enforcement agencies for use to combat illegal

16   drug activities."  Do you dispute any part of that

17   statement, sir?

18      A    It is more involved than that, there is more

19   to it than just that.

20      Q    But is that statement inaccurate?

21      A    It is accurate, but not complete.

22      Q    What would make it complete?

23      A    There is other things that the Northstar

24   program does, and there is other agencies that they

25   provide equipment to, and there is other things other

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 89

1    than illegal drug activities that they use it for.

2        Q    But they do provide military equipment to law

3    enforcement personnel, correct?

4        A    Oh, they do.

5        Q    And part of that use, at least, is to combat

6    illegal drug activities, correct?

7        A    Yes.

8        Q    The next sentence states, "A law enforcement

9    agency can apply to obtain military items from this

10   program." Do you dispute that statement?

11       A    No.

12       Q    The next sentence is, "Once approved, the

13   agency can request and receive a variety of military

14   items ranging from clothing and binoculars to helicopter

15   parts." Do you dispute that statement, sir?

16       A    I'm not sure about helicopter parts, but there

17   are a variety of military items.

18       Q    And that would include clothing?

19       A    Clothing and binoculars, but I don't know

20   about helicopter parts.

21       Q    The next sentence says, and it goes on to the

22   next page, "D'Angelo was the screener for the

23   Connecticut State Police and requested and received

24   various military items." Is that an accurate statement?

25       A    Yes.

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 206

1      A      No.

2      Q      And you are good friends with him?

3      A      I was.

4      Q      You haven't been since this happened?

5      A      It is less friends, you know, thanks to these

6   guys.

7      Q      Have you been hunting with Mr. DiChello since

8   you were arrested?

9      A      I do not believe I was, no.

10     Q      Not one time?

11     A      I may have, but in a group.  We may have all

12   been invited by somebody into a group, you know, guys

13   that we hunted with before, but if I was, it might have

14   been once or twice maximum, if I was.  I couldn't even

15   recall the times.

16     Q      How often did you go hunting with him before

17   you were arrested?

18     A      Oh, as much as we could.

19     Q      Meaning?

20     A      Different seasons, you know, five times a

21   month, three times a month.

22     Q      Did you ever share the fruits of your hunting

23   with him, the meat?

24     A      Of course, Commissioner Kirschner, we had a

25   dinner for him.

Brandon Smith Reporting

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                    Eugene D'Angelo

Page 207

1    Q    Who is we?

2    A    Mr. DiChello, myself, several other men in the

3    neighborhood, and some political people, and when he

4    became the Commissioner, he went to Pat DiChello's house

5    we had a large dinner at a table just like this.

6    Q    What did you serve, what was the meat that was

7    served?

8    A    Game.

9    Q    Different kinds?

10   A    Deer, Buffalo, bear, elk, moose, a lot of

11   things.

12   Q    Was any of the meat ground?

13   A    No, it was not.

14   Q    The next sentence says, "That some time last

15   year D'Angelo gave him a stainless steel meat grinder

16   that needed some work."  And you don't dispute that you

17   gave Mr. DiChello a stainless steel meat grinder that

18   needed some work, right?

19   A    No.

20   Q    "That he had it repaired and uses it to make

21   sausage."  You don't dispute that, do you?

22   A    No.

23   Q    "Mr. DiChello then showed the investigators

24   the grinder which was in his basement."  You don't

25   dispute that, do you?

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                      Eugene D'Angelo

Page 208

```
 1      A     No.

 2      Q     It is a stainless steel commercial grade meat

 3  grinder bearing a certain stock number.  You don't

 4  dispute that, right?

 5      A     No.

 6      Q     "Mr. DiChello is a civilian and is, therefore,

 7  not entitled to this property."  Do you dispute that

 8  statement?

 9      A     Yes.

10      Q     Why?

11      A     There is no rule or regulation that he's not

12  entitled to that garbage.  Nothing that says that.

13      Q     There is nothing that says that?

14      A     I have not read a thing that says that.

15      Q     Okay.  So anything -- well, let me ask you

16  this.  Was there a rule that said that they couldn't

17  have valuable Northstar equipment, civilians?

18      A     There is a rule that says you can't have -- I

19  can't remember the word, flak jackets, helmets, things

20  like that, there is only two or three items.

21      Q     Where is that rule written down?

22      A     I don't know, that came from the Northstar

23  base, the person at the base, the screener, the

24  supervisor, said the only things you can't give away,

25  now, Tiska was there, Lieutenant Colonel Tiska, said the
```

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004

Eugene D'Angelo

Page 209

1  only things you can't give away that you have to keep a

2  close eye on are helmets and flak jackets.

3      Q   And who said that, Lois?

4      A   It was Lois, and there was another guy up in

5  New York.  If you said the name, I would know the name.

6  Lois said that, though, four sure.  You can't give away

7  helmets.  Or maybe it wasn't Lois, it was the guy who

8  gave us those helmets, who loaded the helmets with us, a

9  guy with a vet, a disabled vet who was working there.

10      Q   And he was with the federal government?

11      A   The program, yes.

12      Q   And who was there when he said that?

13      A   I know Colonel Tiska was there, if he heard

14  him or not, I don't know, but the guy did tell us that,

15  myself, and I don't know who the other person was.

16      Q   Did you ever see a written rule about what

17  civilians could or could not receive?

18      A   No.

19      Q   So the last sentence of that paragraph, "A

20  written statement was taken from him," meaning

21  Mr. DiChello, "and the meat grinder was seized."  You

22  don't dispute that, do you?

23      A   No.

24      Q   And then you were in fact arrested, right?

25      A   Correct.

Brandon Smith Reporting

c8fdf28e-a3a6-436e-9572-fa5109832f4f

D'Angelo vs Kirschner, et al

6/2/2004                                                                                Eugene D'Angelo

                                                                                            Page 241

1                        CERTIFICATE OF REPORTER

2          I, Robin L. Balletto, RPR, a Notary Public duly

3      commissioned and qualified in and for the State of

4      Connecticut, do hereby certify that pursuant to Notice,

5      there came before me, on the 2nd day of June, 2004, at

6      10:10 a.m., the following named person, to wit:

7      Eugene D'Angelo, who was by me duly sworn to testify to

8      the truth and nothing but the truth; that he was

9      thereupon carefully examined upon his oath and his

10     examination reduced to writing under my supervision;

11     that this deposition is a true record of the testimony

12     given by the witness.

13         I further certify that I am neither attorney nor

14     counsel for, nor related to, nor employed by any of the

15     parties to the action in which this deposition is taken,

16     and further, that I am not a relative or employee of any

17     attorney or counsel employed by the parties hereto, or

18     financially interested in the action.

19

20         IN WITNESS THEREOF, I have hereunto set my hand and

21     affixed my seal this _14_ day of _June_,

22     2004,

23                          _Robin L. Balletto_

24                          Robin L. Balletto
                            License No. 00230
                            Notary Public
25     My Commission expires:  10/31/08

Brandon Smith Reporting

c8fdf28e-a3a6-436e-9572-fa5109832f4f