**STATE OF CONNECTICUT**
**DEPARTMENT OF PUBLIC SAFETY**
**DIVISION OF STATE POLICE**

Case Number I97-008334
Date 01/15/97
Time Started 3:00:47 PM
Time Ended

WITNESS STATEMENT OF  Terrence K.  Langin

I,  Terrence K.   Langin,  date of birth  09/26/53

of  281 Main Street South , town/city of  Woodbury   CT

make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true, and which statement is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

I am employed by the Town of Woodbury as a Police Officer and have been for approximately nine years.

In mid December I went with the Woodbury Resident Trooper, Tfc. Binkowski to a storage area in Meriden where the State stores military items which were obtained through the Northstar program. This storage area is maintained by the State Police and I later learned it was maintained by Det. Eugene E. D'Angelo of the Statewide Narcotics Task Force.

When we went to Meriden in order to see what had happened to the Gortexs Parkers we were suppose to have gotten in the last shipment we had received from the Military.

Prior to our arrival in Meriden, Binkowski had informed me that he had a gun with him, that he was going to give to D'Angelo. I'm not sure what type of gun it was but I am sure it was a semi-auto. Binkowski also had a 45 caliber semi automatic he wanted to show D'Angelo.

Upon our arrival in Meriden I was introduced to Gene D'Angelo by Tfc. Binkowski as the Quartermaster for the Woodbury Police. Tfc. Binkowski had also told D'Angelo that I was a collector of guns and that I had been in the Woodbury Police Department when people would come in from Town to turn unwanted guns into the Department.

At this time, D'Angelo started asking me what types of guns I had in my collection. I just explained I had a small collection. At this point we walked into the storage building through the front door and then to the right into a small office. We continued to talk about guns and some of the military items which were lying around D'Angelo's office.

At some time during our conversation in the office Tfc. Binkowski handed D'Angeo a semi-automatic pistol. Tfc. Binkowski asked D.Angelo if he wanted the gun and D'Angelo said something to the fact that " he could make some kind of a trade". D'Angelo took the gun and was just looking at the weapon and saying this is great. At this point he, D'Angelo, unlocked a padlock which was attached to the right lower desk drawer. He placed the gun in the drawer and we continued to talk. I believe Binkowski then showed D'Angelo his 45. D'Angelo said something to the fact as what could we trade for this.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness: _____ #1196    Signature: _____ #8
Witness: _____

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein.

If notarized, endorse here: _____

Page 1 Of 3

MASTER COPY [✓]   TROOP COPY [ ]   CITIZEN COPY [ ]

©1994 Hunt & Hanahan Computer Designs                                      SP-633-C REV. 10/94

STATEMENT OF  Terrence K. Langin  (Cont.)

Binkowski told D'Angelo that the 45 cal. wasn't up for trade, he just brought it to show him. Binkowski then turned the conversation back to the original reason we were there. He asked D'Angelo about the Gortex Parkers we had ordered. That we hadn't received all of them and the ones we did receive were ripped and worn out. Also the ones we received were all mediums and where should have been some large parkers there. That the packing slip stated there were suppose to be approximately 12 jackets and we only received approximately (9).

At this time we all walked out into the wearhouse and D'Angelo called one of his employees and told him to get us (3) gortex parkers.

We continued walking around the building, during this time, I noticed some large safes lying standing by the door way and I mentioned to D'Angelo, I had training as a locksmith. He then asked if I thought the locks could be repaired of the safes he had there. As I was looking at the safes, D'Angelo asked Binkowski to take a walk outside. He, D'Angelo told Binkowski he had something to show him out in his, D'Angelo's, vehicle which was parked out in front of the building.

At this time both Binkowski and D'Angelo left the building and I remained inside and looked at the locks on the safes along with D'Angelo's employee.

Approximately 10 minutes later both Binkowski and D'Angelo came walking back inside. When they returned back inside I told D'Angelo that with a couple of hours the locks could be repaired on the safes.

We then continued looking around the wearhouse. D'Angelo asked if I needed a pair of winter air-boots and also if I needed and shirt and or pants. He, D'Angelo had his employee put some old military pant along with a few military worn shirts in a bag for me to take when I left.

D'Angelo then took both myself and Binkowski on a tour of his building. He advised us he was taking us into parts of the building not everyone gets to see. He then showed us some of the rooms which were locked. He also during this time advised both Binkowski and myself that he had a lot of items which could be traded. After taking us through the building and the garage area, we walked back out front of the building. At this time the conversation returned back to guns. He D'Angelo again asked about my gun collection again. At this point D'Angelo asked me to take a walk out to his vehicle out in front of the building. He advised me he had a pair of military binoculars out in his truck. We walked out side and in the front seat of his vehicle he pulled out a metallic type box, opened it and pulled out a pair of green rubber coated military binoculars. He, D'Angelo handed the binoculars to me and told me to look through then. He said they were the top of the line and they would last a lifetime plus.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness: _Det C__ P. _____ 1186_   Signature: _____ #5
Witness: _____

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein.
If notarized, endorse here: _____

Page 2 Of 3

MASTER COPY [X]   TROOP COPY [ ]   CITIZEN COPY [ ]

STATEMENT OF Terrence K. Langin (Cont.)

He then asked about my guns again. He said something to the fact that I had a 45 cal. and he would be willing to make a trade, the 45 cal. for the binoculars. I just handed the binoculars back to D'Angelo. At this time D'Angelo put the binoculars back into the box and placed the box back into his vehicle.

At this time a few other officer arrived from another Police Department, I believe they may have been from Cheshire or Meriden. We went back into the building along with the other guys and talked for a while about the program Northstar. Both myself and Binkowski determined it was time to leave and Binkowski asked D'Angelo to give him back the 45 cal. which was stored in his desk drawer.

After Binkowski got his gun back we left.

On the ride home we talked about what was going on with D'Angelo. We talked about what D'Angelo was doing and if he was to get caught he would end up in Leavenworth. The more we talked about what was going on Binkowski had said he should get in touch with D'Angelo and have him sign some type of transfer paper for the gun. I told Binkowski that it would probably be a good idea just in case it hit the fan.

That I believe it was the next day when Binkowski asked if I have D'Angelo's home telephone number and or pager number. D'Angelo had given me one of his business cards with both his home and pager numbers on it.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness: Det C. P. Ough #1186    Signature: [signed] #5
Witness:

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein.

If notarized, endorse here: Sworn before me 1/15/97 at 1720 hrs   [signed]

Page 3 of 3

MASTER COPY [✓]   TROOP COPY [ ]   CITIZEN COPY [ ]

STATE OF CONNECTICUT
**DEPARTMENT OF PUBLIC SAFETY**
DIVISION OF STATE POLICE

Case Number I-97-008334
Date 01/24/97
Time Started 07:35 PM
Time Ended 12:40:10 PM

WITNESS STATEMENT OF  TERRANCE K. LANGIN

I, TERRANCE K. LANGIN, date of birth 09/26/53

of 281 MAIN STREET SOUTH, town/city of WOODBURY CT

make the following statement, without fear, threat, or promise. I have been advised that any statement(s) made herein which I do not believe to be true, and which statement is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

I am employed by the Town of Woodbury as a Police Officer and have been for approximately nine years.

On December 20, 1996 I went with the Woodbury Resident Trooper, TFC. Binkowski to the complex in Meriden where the State Police stores military items which are obtained thought the Northstar program. On the way to Meriden Binkowski and I were talking about many different things including the interest that Gene D'Angelo has in guns. During the conversation Binkowski told me that he was bringing an old gun to give to D'Angelo and that he had also brought a 45. Caliber pistol to show him and to get him excited. When I arrived at the warehouse I was amazed at the amount of military equipment that was in the building. After watching D'Angelo in action it was very obvious that all the items in the warehouse good and bad were available for personal use. I was brought to this conclusion based on the conversations that I overheard while I was in the warehouse with D'.Angelo and Binkowski. While D'Angelo was taking us through the warehouse selecting items and asking us if we needed any. When we came upon the shovels D'Angelo asked us if we needed a shovel and I said yes I could use one for my car. Binkowski also said that he was interested in having a shovel in his car. D'Angelo grabbed a bunch of them and threw them into our bags. He said take a couple, put one in your car and your wives car. When we came to the area where the winter mittens were Binkowski asked D'Angelo if he had any inserts. D'Angelo gave Binkowski and I cold weather mittens and inserts. Some time around the time we received the mittens I believe that Binkowski made a comment something to the effect that these mittens would be good for ice fishing. I believe e that while we were looking through boxes filled with jackets Binkowski asked D'angelo if he had a type of flight jacket for his father-in-law. D'Angelo went into a box and pulled out a jacket and placed it into one of the duffel bags. While we were in one of the back rooms we saw a stack of foot lockers and Binkowski asked if he could have a foot locker because it would be good for storing tools in his garage. I also asked if I could have a foot locker and D'Angelo said sure take one.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness: _[signature] #1186_   Signature: _[signature] #5_
Witness: _____

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein.

If notarized, endorse here: _Sgt. Eric Stevens #174_

Page 1 of 2

MASTER COPY ☐   TROOP COPY ☐   CITIZEN COPY ☐

©1994 Hunt & Hanahan Computer Designs                                    SP-633-C REV. 10/94

Case 3:02-cv-01313-SRU   Document 70-7   Filed 11/14/2005   Page 5 of 5

SP-630-C REV. 9/83

STATE OF CONNECTICUT
DEPARTMENT OF PUBLIC SAFETY
DIVISION OF STATE POLICE

I-97-008334

STATEMENT OF   TERRANCE K. LANGIN          (Cont.)

In the same area there was boxes of tie down straps that D'Angelo went into and started handing out. The conversation between D'Angelo and Binkowski was that the straps would be good to be used to hang things in the garage. As we were hanging around Binkowski noticed a snowmobile inside the garage. Binkowski commented to D'Angelo that you can get these too, it would be nice to have one of those. D'Angelo replied by saying something to the effect of anything can be gotten. We noticed that there was a generator in the back of a pickup truck. Binkowski and I both inquired about the generator as to is power ability. D'Angelo explains that it would power this building and that the generator like other things is obtainable. I believe that both I and Binkowski would believe after our conversations with D'Angelo that these items such as the snowmobile and generator and many other items in the building would be used for personal use and not for Law Enforcement purposes. Both Binkwoski and I believed that some of the the items received from D'angelo were for personal use and others were for Police work

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness: _____ #1186    Signature: _____ #5

Witness: _____

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein.

If notarized, endorse here: _____

Page 2 of 2

MASTER COPY [ ]   TROOP COPY [ ]   CITIZEN COPY [ ]